APPEAL,JD1,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: <u>1:23–cv–00645–NYW</u>
### *Internal Use Only*

| | |
|---|---|
| Shaver v. Whittier Condominiums HOA | Date Filed: 03/13/2023 |
| Assigned to: Judge Nina Y. Wang | Date Terminated: 05/09/2023 |
| Demand: $5,000,000 | Jury Demand: None |
| Case in other court:  U.S. Court of Appeals for the Tenth Circuit, 23–01197 | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |
| Cause: 42:1983(c)(v)(p) – Civil Rights (Personal Property) | |

**Plaintiff**

**David William Dacres Shaver**              represented by   **David William Dacres Shaver**
                                                             1750 30th Street
                                                             #A338
                                                             Boulder, CO 80301
                                                             303–351–4239
                                                             PRO SE

V.

**Defendant**

**Whittier Condominiums HOA**
*(City of Boulder has been sent Notice)*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/13/2023 | <u>1</u> | COMPLAINT for Cause of Action: Replevin against Whittier Condominiums HOA (Filing Fee: $402.00, Receipt Number: 106315), filed by David William Dacres Shaver. (Attachments: # <u>1</u> Civil Cover Sheet, # <u>2</u> Exhibits, # <u>3</u> Attachments, # <u>4</u> Summons, # <u>5</u> Notice of a Lawsuit and Request to Waive Service of a Summons, # <u>6</u> Waiver of the Service of Summons, # <u>7</u> Declaration of Facts, # <u>8</u> Proposed Writ of Assistance) (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | <u>2</u> | Unsealed MOTION for Suppressing or Sealing by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | <u>3</u> | RESTRICTED DOCUMENT – Level 1: Sealed Memorandum in Support of Sealing to # <u>2</u> Motion by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | <u>4</u> | RESTRICTED DOCUMENT – Level 1: Affidavit by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | <u>5</u> | RESTRICTED DOCUMENT – Level 1: Exhibit A to # <u>1</u> Complaint by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | <u>6</u> | |

| | | RESTRICTED DOCUMENT – Level 1: Exhibit B to # 1 Complaint by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
|---|---|---|
| 03/13/2023 | 7 | RESTRICTED DOCUMENT – Level 1: Exhibit K to # 1 Complaint by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | 8 | OBJECT to Assignment to Magistrate Pursuant to Colorado Rules for Magistrates by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | 9 | BRIEF in Support of # 1 Complaint, by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | 10 | EMERGENCY MOTION for Preliminary Injunction by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | 11 | MOTION for Judicial Review of Forum and Jurisdiction Clauses by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | 12 | MOTION for Permissive Joinder of Third Parties if Appropriate by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | 13 | Pre–Pleading Memoranda of Law in Support of 12 MOTION for Joinder filed by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | 14 | MOTION to Perform Site Inspection by Plaintiff David William Dacres Shaver. (blaws) (Entered: 03/14/2023) |
| 03/13/2023 | 15 | Case assigned to Judge Nina Y. Wang. Text Only Entry. (blaws) (Entered: 03/14/2023) |
| 03/14/2023 | 16 | ORDER TO SHOW CAUSE: Plaintiff shall SHOW CAUSE, in writing, on or before **March 31, 2023**, why this case should not be dismissed without prejudice for lack of federal subject matter jurisdiction. By Judge Nina Y. Wang on 3/14/2023. (trvo, ) (Entered: 03/14/2023) |
| 03/14/2023 | 17 | CERTIFICATE of Service by Mail by Clerk of Court re 16 Order to Show Cause to David William Dacres Shaver at 1750 30th Street #A338 Boulder, CO 80301. Text Only Entry. (trvo, ) (Entered: 03/14/2023) |
| 03/14/2023 | 18 | Exhibits in Support of 1 Complaint, by Plaintiff David William Dacres Shaver. (Attachments: # 1 Exhibit D, # 2 Exhibit E, # 3 Exhibit F, # 4 Exhibit G, # 5 Exhibit H, # 6 Exhibit I) (blaws) (Entered: 03/16/2023) |
| 03/15/2023 | 19 | MOTION for Permissive Joinder of 3rdP If Appropriate by Plaintiff David William Dacres Shaver. (trvo, ) (Entered: 03/17/2023) |
| 03/15/2023 | 20 | Declaration of Facts Regarding Notice to Christine Mollenkopf by Plaintiff David William Dacres Shaver (trvo, ) (Entered: 03/17/2023) |
| 03/27/2023 | 21 | Declaration of Facts Regarding Notice to City of Boulder by Plaintiff David William Dacres Shaver. (sdunb, ) (Entered: 03/28/2023) |
| 03/27/2023 | 22 | SUMMONS REQUEST as to Whittier Place Condominiums HOA, Inc. by Plaintiff David William Dacres Shaver. (sdunb, ) (Entered: 03/28/2023) |
| 03/28/2023 | 23 | SUMMONS issued by Clerk. (sdunb, ) (Entered: 03/28/2023) |
| 03/31/2023 | 24 | |

| | | |
|---|---|---|
| | | RESPONSE TO 16 ORDER TO SHOW CAUSE by Plaintiff David William Dacres Shaver. (trvo, ) (Entered: 04/04/2023) |
| 03/31/2023 | 25 | CERTIFICATE of Service by David William Dacres Shaver (trvo, ) (Entered: 04/04/2023) |
| 04/03/2023 | 26 | Conventionally Submitted Material: 1 USB Drive re 25 Certificate of Service by Plaintiff David William Dacres Shaver. Material placed in the Clerk's Office A−1−7. Text Only Entry. (trvo, ) (Entered: 04/04/2023) |
| 04/12/2023 | 27 | ORDER. The Order to Show Cause [Doc. 16 ] is **MADE ABSOLUTE**. Plaintiff's Complaint [Doc. 1 ] is **DISMISSED without prejudice** for lack of subject matter jurisdiction. Plaintiff is GRANTED LEAVE to file an amended complaint within 21 days of the date of this Order. Plaintiff is ADVISED that any amended pleading must comply with Rule 8 and Rule 10 of the Federal Rules of Civil Procedure. Plaintiff is ADVISED that if he fails to file an amended pleading by the Court's deadline, this Court will direct the Clerk of Court to terminate this case without further warning from the Court. The pending Motions in this case [Doc. 2 ; Doc. 10 ; Doc. 11 ; Doc. 12 ; Doc. 14 ; Doc. 19 ] are **DENIED without prejudice as moot**. By Judge Nina Y. Wang on 4/12/2023.(trvo, ) (Entered: 04/12/2023) |
| 04/12/2023 | 28 | CERTIFICATE of Service by Mail by Clerk of Court re 27 Order to David William Dacres Shaver at 1750 30th Street #A338 Boulder, CO 80301. Text Only Entry. (trvo, ) (Entered: 04/12/2023) |
| 04/13/2023 | 29 | CERTIFICATE of Service by David William Dacres Shaver. (trvo, ) (Entered: 04/13/2023) |
| 04/14/2023 | 30 | Conventionally Submitted Material: 1 CD containing Exhibit L, Communications & Logs of 4.12 by Plaintiff David William Dacres Shaver. Material placed in the Clerk's Office A−1−7. Text Only Entry. (trvo, ) (Entered: 04/14/2023) |
| 05/03/2023 | 31 | BRIEF in Support of Complaint for Replevin/Preliminary Injunction, by Plaintiff David William Dacres Shaver. (angar, ) (Entered: 05/04/2023) |
| 05/03/2023 | 32 | Response and Motion to Stay/Extend Termination/Order of 4.12 Pending Indented Appeal Outcome, by Plaintiff David William Dacres Shaver. (Attachments: # 1 Certificate of Service, # 2 Exhibit, # 3 Exhibit)(angar, ) (Entered: 05/04/2023) |
| 05/09/2023 | 33 | ORDER denying 32 Response and Motion to Stay/Extend Termination/Order of 4.12 Pending Intended Appeal Outcome. Because Plaintiff's Complaint has been dismissed without prejudice for lack of subject matter jurisdiction, and because Plaintiff has not filed an amended pleading by the Court's deadline, this case is terminated, by Judge Nina Y. Wang on 5/9/2023. (ebuch) (Entered: 05/09/2023) |
| 05/09/2023 | 34 | FINAL JUDGMENT in favor of Defendant Whittier Condominiums HOA and against Plaintiff David William Dacres Shaver pursuant to 27 and 33 Orders, by Clerk on 5/9/2023. (ebuch) (Entered: 05/09/2023) |
| 05/09/2023 | 35 | CERTIFICATE of Service by Mail by Clerk of Court re 33 Order and 34 Final Judgment to David William Dacres Shaver, 1750 30th Street, #A338, Boulder, CO 80301. Text Only Entry (ebuch) (Entered: 05/09/2023) |
| 06/07/2023 | 36 | NOTICE OF APPEAL as to 34 Judgment, 33 Order, by Plaintiff David William Dacres Shaver. (trvo, ) (Entered: 06/08/2023) |

| 06/08/2023 | 37 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 36 Notice of Appeal filed by David William Dacres Shaver to the U.S. Court of Appeals for the Tenth Circuit. (Pro Se, Fee not paid and 1915 motion not filed) (Attachments: # 1 Docket Sheet, # 2 Preliminary Record)(trvo, ) (Entered: 06/08/2023) |
|---|---|---|
| 06/08/2023 | 38 | USCA Case Number 23–1197 for 36 Notice of Appeal filed by David William Dacres Shaver. (trvo, ) (Entered: 06/08/2023) |
| 06/22/2023 | 39 | USCA Appeal Fees received $505, receipt number 107365; Full Payment (USCA Case No. 23–1197) (trvo, ) (Entered: 06/22/2023) |

| ☐ District Court ☐ Boulder County ☐ Boulder Municipal Court<br>☒ Federal Court<br>Address: 901 19th Street, Denver, CO 80294 | **FILED**<br>**UNITED STATES DISTRICT COURT**<br>**DENVER, COLORADO**<br>**03/13/2023**<br>**JEFFREY P. COLWELL, CLERK** |
|---|---|
| Plaintiff:          David William Dacres Shaver<br>Vs. Defendant(s):   Whittier Condominiums HOA<br>                        (City of Boulder has been sent Notice) | **Δ COURT USE ONLY Δ** |
| 'Pro Se' Party/Not member of Colorado Bar (Name and Address):<br><br>David William Dacres Shaver<br>1750 30th St Suite A338, Boulder CO 80301<br>Phone Number: 303-351-4239 eMail: davidwshaver@yahoo.com | Case Number: |

### Complaint for Cause of Action : Replevin [Based on JDF 116](FRCP Rule 64 &/or CRCP 104)

This is an action to recover possession of personal property and/or damages, within the demesne of this court. On 10/19/21, a fire occurred at the 'Whittier Place Condominiums' complex, located at 2301 Pearl Street, which damaged the building(s) and Condominium #39 containing Plaintiff's property. If recovery can't be affected at the Condominium, collection of replacements may be required elsewhere.

**Plaintiff** believes that this Court has jurisdiction over matters herein pursuant to FRCP Rule 64 or C.R.S. §13-6-104(1) due in part to personal property claimed having been valued above the limit of lesser courts, and that this Venue is the most proper, as this Court's authority encompasses physical personal properties which Plaintiff seeks to retrieve (which may potentially be interstate), identified in this complaint, and the (potential) Defendant(s) reside within it also. Further that acts which have prevented Plaintiff from recovering said property, or its value, occurred therein also. Moreover that the issues involve interpretations of the U.S. Constitution's 4th, 5th and 14th amendments (pursuant to 28 U.S.C.§1331). Plaintiff thus believes this the most appropriate avenue for Complaint.

**1)** A list + valuation of personal property claimed may be attached to this Action, marked "Exhibit A".

**2)** Plaintiff is the owner of the property claimed or is entitled to possession of the properties due to Plaintiff having legally acquired all such, storing said possessions and being the sole resident at this address for over 18 years now (and is willing to supply testimony under oath to that effect).

**3)** The Plaintiff's interest in such property is further evidenced by electronic and/or written instruments.

**4)** Copies of varying detail intended to be provided if after passage of the supplied "**Motion to Seal**"

**5)** Plaintiff believes his property is wrongfully being detained by the Defendant(s) against the Plaintiff's claim of right to possession, and with Plaintiff's attempts at 'self-help' or repossession denied.

**6)** The means by which the Defendant(s) came into possession of the property and the specific facts

constituting detention against the right of the Plaintiff(s) to possession are as follows: **'(State (♦) the source of your right to the property, (◊) how the Defendant(s) took possession, and (∇)why you believe the Defendant(s) is/are wrongfully detaining the property from you)':**

**♦A)** The vast majority of personal possessions therein were acquired by Plaintiff over his lifetime, and included such items as trophies won in 'Swim Team' or 'Boy Scouts' or childhood, considered irreplaceable.  Plaintiff has been the sole occupant of the Condominium for over 18 years, the property having originally been acquired by his Father (<u>Marvin Dean Shaver</u>, formerly Chief of Accounts Receivables of the **Federal Mineral Management Service**) in order to provide housing while Plaintiff was attending University; upon his Father's recent death in 11/2020, this was assimilated into a Trust, which he was told was supposed to be converted into a separate Trust in his name.

• Plaintiff and Trustee were recently involved in litigation primarily regarding the sale of the family residence [Ref: Jefferson County #21C417+21CV137 and Denver Probate: 2021PR030635], in which a Judge Ordered that possessions be removed from 246 Aspen Lane in Golden, which were moved to said Condominium. {Note: Somehow while Plaintiff was engaged in litigation with the **Tampa Florida** Trustee, <u>'Members Trust Company'</u> in Colorado (represented by 'Holland and Hart LLP'), records show the Whittier HOA was reregistered to a **Florida** Co. w/**Tampa office ('**<u>Sentry Property Management</u>**'** owned by a 'James W. Hart' ), apparently coinciding w/court filing dates : reported to Detective Sarah Cantu, 11/9/2021+, WRT Case#21-10021} [<u>**see also Moye+ Affidavit**</u>].

**♦B)** A large additional quantity of Plaintiff's possessions were recently moved from long term storage from where he grew up at his ancestral residence, 246 Aspen Lane, to 2301 Pearl #39, as a result of [Court Order#1 of 2021.08.02 in Denver Probate C#2021PR030635]

**♦C)**  Plaintiff was an owner of a Colorado LLC 'Astrobyte' which merged with an Oregon Corp ('Extensis') in 1/1998, for which he received 'merger consideration' in the form of stock.  [Instead of going public as originally claimed, the Oregon company merged with a series of entities, then effectively laundered its intellectual properties by selling them with the original Extensis name to a Japanese firm].  This Stock has not been saleable for anywhere near written representations

received as to its value (and Plaintiff's Attorneys who originated the merger agreement have not yet been willing to represent him in pursuit of the matter, claiming amongst their primary consideration that the opposition had a larger 'war chest').  Plaintiff and his family members have since been harassed for decades by agents of the Oregon Department of State Lands, who from his perspective appear to have effectively been attempting to extort him into what the merger agreement describes as an act to 'surrender his shares', effectively selling the stock to them for a lesser valuation than intended by the merger, nowhere near written representations of the value thereof received (which appear likely to be considered subject to confidentiality terms of the merger agreement).  Both the Merger Agreement (paper in loose-leaf binder, likely to be water damaged), and Stock (in fireproof safe) are at the 'Condominium'. Plaintiff requested an electronic copy from Plaintiff's Attorneys, and eventually received a copy (which may be provided in association with 'permissive joinder' motions of this complaint).  Without revealing information which may qualify as confidential, Astrobyte was generating 7 figures in revenues prior to the merger, thus Plaintiff thinks you should be able to infer that the valuation of the merger consideration was supposed to be considerably higher than that.  Plaintiff had been saving the stock as a ~'Collectors Item', along with other such stock certificates (and collectible stamps) in his fireproof safe, which, complete with provenance showing the value that this should have been worth, might likely alternatively someday be worth considerably more than the ~pittance that Oregon DSL has offered so far.  Plaintiff's mailing address is in a store otherwise specialising in 'Collectible's [Exh_C] http://www.collectons.com.

◊**D)**  Shortly after 3:30AM on the night of 10/19/21, Plaintiff was ordered to immediately leave the apartment by a relatively short female police officer banging incessantly on the door, and blocked from returning by a neighbor; although fire personnel and police in the days to follow indicated that residents would be allowed back in within days, this never happened, and Plaintiff has since received refusals in response to attempted repossessions.  Plaintiff would not have left in the way that he did (leaving even his wallet and cell phone behind) had he not been ordered to do so, as he had his own escape plan in place, including climbing harness and rope for orderly exit of the unit via the balcony with much more of his most valued possessions intact.

√**E)** Plaintiff believes that the refusals to allow access to the condominium are in violation of U.S. law in a number of ways, as illustrated in the accompanying filings including "**BRIEF IN SUPPORT OF COMPLAINT/REPLEVIN OR MOTION FOR PRELIM INJUNCTION ''**.

√**F)** Due to the City's enforcement, including 'no trespassing' signs placed around the building (with the city attempting to press charges for infringement when Plaintiff attempted to visit, after having been given assurances that the HOA would not be (reference Boulder Metro **Report #:21-11210 Complaint #:G176765**), and reported support for imminent preparations to tear the complex down without allowing residents to recover their possessions, a 'Notice of Claim' has been pre-emptively filed (with 'CorVel', as requested on the bouldercolorado.gov web site) in order that they may be Joined if necessary also.

√**G)** Plaintiff has had multiple conversations with the HOA, from within a week after the incident onwards, in which he expressed his opinions [Ex_F], and indicated a preference for recovery of his personal possessions.  The HOA has by and large been unresponsive and obstructive to his efforts; when willing to give a response at all, they have indicated that their insurance was a major factor. Plaintiff has suggested means of recovery such as via rope access technicians (for which he even located training facilities in the area that residents might use), or via robotic means, to which the HOA has been unresponsive.  Their insurance company eventually produced an 'engineering report' in which their own engineers expressed opposing (and self-contradictory!) opinions, apparently on the walkability of the internals of structures, which even appears to indicate that they felt that areas of the unit below were 'safe' but areas of Plaintiff's unit directly above weren't. [Ex_C]. No opinions on rope access were expressed, residents were not provided with video which was reportedly taken of the internals of some units, and only a single 'salvage' company was proffered, which charged exorbitant rates to recover from those units apparently deemed walkable.  Plaintiff provided AD&D insurance policy which he offered to use during self-help, but the HOA refused to evaluate its suitability, claiming that he would have to purchase it first (& refused to pay for that). Plaintiff's Trustee also contacted HOA, who reportedly lied about providing opportunity to access.

**7)** To the best of the Plaintiff(s)' knowledge, information and belief, according to Colorado and

Boulder public records, the original* Defendant(s) have a residence and business address at:

Whittier Condominiums HOA          (City of Boulder has been sent 'Pre-emptive Notice of Claim*)

President: Christine T Mollenkopf

3445 CASTLE PEAK AVE, SUPERIOR, CO

**8)** To the best of Plaintiff(s) knowledge, information and belief, surviving significant portions of the property at issue presently are located at the address: **2301 Pearl Street, #39, Boulder, CO**

**9)** Plaintiff(s) has made demand or request upon the Defendant(s) for return of the property or allowance for or facilitation of 'self-help' by Plaintiff or his Agents in retrieving Plaintiff's property. Plaintiff(s) has not received the property from the Defendant(s), nor approval(s) to retrieve it, despite such demand or request and continues to be deprived of the use and enjoyment of the property.

**10)** Plaintiff does not believe that the property at issue can be considered as having been taken for a tax assessment or a fine pursuant to statute; or seized under an execution against the property of the Plaintiff(s); or if so seized, it is by statute exempt from seizure.

**11)** Federal or Colorado rules or law such as CRCP 104 or CRCCP 404 or FRCP 64 indicate that the Plaintiff(s) is entitled to an order of this Court directing the Defendant(s) to restore the Plaintiff(s) possession of the property may be seen in "Exhibit A + B", and/or for judgment for the value of any irrecoverable thereof, if recovery or delivery cannot be made, and/or for any damages over detention of the property, and/or obstruction of Plaintiff's ability to use 'self-help' to repossess it himself or via agents.

**WHEREFORE,** Plaintiff(s) respectfully Prays for, and requests the following relief, God Willing:

**X** That the Court issue an Order to Show Cause directed to Defendant(s), if appropriate, to show cause why properties listed in the Action should not be obtained from Defendant(s) and delivered to Plaintiff;

**X** That the Court set a Show Cause Hearing within 14 days (i.e. as required by CRCP Rule 104(c) or CRCCP 404(c)), if appropriate, to make a preliminary determination concerning the right to possession of properties described in the Complaint;

**X** That the Court enter judgment for the Plaintiff(s) for the possession of the property listed in the Complaint or for the value thereof, in case delivery cannot be made, plus damages including for detention and for any property not returned or returned in damaged condition [**Writ of Assistance** Attached];

**X** That the Court award the Plaintiff(s) court costs, any attorney fees, and/or applicable quantum meruit.

**X** That the Court halt issuance of permits and/or issue Preliminary Injunction(s), as necessary, to pause any demolition of the containing building until such time as prioritised recovery has been affected.

**X** That the Court consider the attached **Motions,** i.e. for Permissive Joinder, with/for associated filings, if it is assured that 1) it is sufficiently appropriate to act on them as to not incur any attorney fee penalties upon Plaintiff, and 2) is capable of sufficiently addressing all significant issues which might otherwise incur 'Res Judicata' for further pursuit (and in doing so, allow amendment with/of those associated 'Causes of Action' & 'Pre-Pleading Memoranda' into more detailed ones in support of said Causes).

**X** Plaintiff prefers his personal property to be recovered (& special damages in the amount of written representations of the Stock, especially if that's not recovered) & judicially determined damages >=$5M

**WHEREFORE, Plaintiff** further Moves that, God Willing, this Court should issue any and all necessary order(s), i.e. for 'Replevin' and/or other Writs which may require Parties to immediately seize/facilitate or return possession of personal property to Plaintiff, and/or for any ~Injunction or other actions necessary to avoid destruction of its containing building until recovery of properties or damages have been affected, and/or to allow Plaintiff to use 'self-help' to recover possessions himself as also supported by accompanied Memoranda, and/or for any other appropriate support of those other Motions attached, and/or for such other and further relief as the Court may deem just and proper.

**Verified Complaint, City and County of Boulder, CO** : **BEFORE ME** personally appeared David W. Shaver, who, being by me first duly sworn, executed the foregoing in my presence and stated to me that the facts alleged herein are true and correct according to his own personal knowledge and belief.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.        [^See 28 U.S.C.§1746; 18 U.S.C.§1621^]

Notary Public: _____        My commission expires 01/19/2026

Signature of 'Plaintiff': _____        (PRO SE)   Date: 3.13.2023

Address: 1750 30th St Suite A338, Boulder CO 80301        Phone: 303-351-4239

RIHAM ABUHAIBA
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20224002733
MY COMMISSION EXPIRES JANUARY 19, 2026

| ☐District Court ☐Boulder County ☐Boulder Municipal Court<br>■ Federal Court<br>Address:<u>901 19th Street , Denver, CO 80294</u> | **FILED**<br>**UNITED STATES DISTRICT COURT**<br>**DENVER, COLORADO**<br>03/13/2023<br>**JEFFREY P. COLWELL, CLERK**<br><br>Δ **COURT USE ONLY** Δ |
|---|---|
| Plaintiff:            David William Dacres Shaver<br>Vs. Defendant(s):   Whittier Condominiums HOA<br>                        (City of Boulder has been sent Notice) | |
| 'Pro Se'Party/Not member of Colorado Bar (Name and Address):<br><br>David William Dacres Shaver<br>1750 30th St Suite A338, Boulder CO 80301<br>Phone Number: 303-351-4239 eMail:davidwshaver@yahoo.com | Case Number: |

## BRIEF IN SUPPORT OF COMPLAINT/REPLEVIN OR MOTION FOR PRELIM INJUNCTION

### Standards for judgement on this issue appear to include FRCP Rule 64, CRCP Rule 104 &| 365

### STATEMENT OF FACTS:

Plaintiff believes that this brief relies upon the Verified Complaint, whose factual allegations & claim(s) demonstrate Plaintiff's entitlement to injunctive relief.  Other filings may include supplemental info.

**INTRODUCTION TO ISSUES:**

Issues include whether the law, including <u>Amendments to the U.S. Constitution</u>, support replevin recovery of his personal property, and/or whether the law should allow for 'self-help'in repossession thereof, and/or whether a preliminary injunction should be temporarily provided to prevent the destruction of 2301 Pearl if it should prove necessary to prevent the destruction of Plaintiff's property:

Historically, under English foundations of common law, a creditor was permitted to use self-help to recover possession of a 'chattel' that was wrongfully detained, provided this could be accomplished without breaching the peace.'  <u>Blackstone's Commentaries on the Laws of England</u>: "Recaption or reprisal is another species of remedy by the mere act of the party injured. This happens when any one hath deprived another of his property in goods or chattels personal, . . . in which case the owner of the goods . . . may lawfully claim and retake them wherever he happens to find them, so it be not in a riotous manner, or attended with a breach of the peace."]

[RULES]

**1)** Forcible Self-help was reportedly effectively the original recourse, before Glanville's "<u>Tractatus de legibus et consuetudinibus regni Anglie</u>" ~invented a more procedural approach to the law, including <u>'replevin'</u> to recover one's property.  Plaintiff's attempts at self-help repossession of his property have been repeatedly rebuffed; his suggestions of alternative methods (i.e. professional rope access techni-

cians, or robotic recovery) met only with silence, his requests for statutory or legal basis ignored.  What few excuses yet given, have largely had reference to insurance policies, rather than the letter or intent of any law.  The situation as it stands appears clearly not to be what the founders of the English legal system intended.  Even the 'Universal Commercial Code' of today (i.e. CRS 4-9-629,4-9-609(2)) shows clear basis for the intent of self-help retaking of one's own property, if you adopt the proper perspective (and some of Plaintiff's company's property, which he effectively lent to himself!, is on premises!).

**2)** According to the United States' Constitution: The 5th Amendment holds that "no person shall be ... deprived of life, liberty, or property, without due process of law .... ", and the 14th Amendment says "no state shall ... deprive any person of life, liberty, or property, without due process of law .... ". Colorado's constitution also contains a due process provision. Section 25 of Article II reads: "Due process of law. No person shall be deprived of life, liberty or property, without due process of law".  If the destruction of the property were allowed to occur before portions of this action were allowed to be decided on its merits, Plaintiff believes that would be a violation of due process.

**3)** Further: U.S. 4th Amendment rights. Under the 4th Amendment, seizures of property must be reasonable under the circumstances. In Segura v. United States, 468 U.S. 796 (1984), the Supreme Court clarified the interpretation of the 4th Amendment, holding that the rights of owners to access their own property can only be delayed for the amount of time necessary to obtain any necessary warrant(s) for investigation. In Chambers v Maroney, 39 U.S. 42 (1970), the Court held that the 4th Amendment's prohibition on unreasonable seizures applies to the seizure of property as well as to the seizure of persons. In U.S. v. Place, 462 U.S. 696 (1983), the Court held that seizures may become unreasonable because of their duration. In Nardone v United States, 308 U.S. 338 340 (1939), the Court held that indirectly enforcing a long-term illegal seizure of residents' property is "inconsistent with ethical standards and destructive of personal liberty."  Other applicable precedents appear to include: United States v. Jacobsen, 466 U.S. 109 (1984): In this case, the Supreme Court held that the 4th Amendment's prohibition on unreasonable searches and seizures applies to the seizure of tangible property, such as packages. Also, Soldal v. Cook County, 506 U.S. 56 (1992): In this case, the Supreme Court held that the 4th Amendment's prohibition on unreasonable seizures applies to the seizure of

mobile homes, & that seizure of a mobile home must be reasonable under the circumstances.

**4)** Colorado Revised Statutes section (i.e. CRS § 24-10-103) lends support for a Cause of Action for Civil Rights violations.  In this case, Plaintiff believes that his, and other residents, U.S. 4th Amendment rights their own property were infringed upon.  His attempts to peacefully use self-help to recover personal possessions were even met with force.  {Prec: 'Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics', 403 U.S. 388 (1971)}.  This case established that individuals have a right to bring a federal Civil Rights action for damages against officials who have violated their 4th Amendment rights.

**5)** Plaintiff has not yet received results from requested investigations, into HOA ownership/agent changes*, or chemical analyses of building construction components.  Plaintiff hereby formally requests (i.e. FRCP 33, 34, 36) Defendant(s) to provide such information. [*DNPC 21PR30635]

**6)** The argument in favor of a preliminary injunction is supported by C.R.C.P Rule 365, according to which injunctions may be granted in Colorado counties if after: "(c)(1) (a) it clearly appears from specific facts shown by affidavit or by the verified complaint or by testimony that immediate and irreparable injury, loss, or damage will result to the plaintiff before the adverse party or the party's attorney can be heard in opposition, and (b) the plaintiff or the plaintiff's attorney certifies to the court in writing or on the record the efforts, if any, which have been made to give notice and the reasons supporting a claim that notice should not be required".  Further, Rathke v. MacFarlane (State of Colorado), 648 P.2d 648 (Supreme Court of Colorado, 1982) established six factors for evaluation of injunctions in Colorado, which Plaintiff believes have been met <see below>.

**7)** In United States v. James Daniel Good Real Property, 510 U.S. 43 (1993), the U.S. Supreme Court held that the government must provide an opportunity for a pre-seizure hearing for property that is ~ subject to forfeiture, to ensure that a resident's property rights are protected.

[APPLICATION]

Plaintiff is of the belief that immediate and irreparable injury, loss, or damage of the sorts outlined in the complaint may result to the Plaintiff if Defendant(s) are allowed to continue in their course of action. Plaintiff has supplied a verified action for replevin, and evidence, which it

believes should satisfy Rule 365's requirements for an injunction. We further believe that Plaintiff's complaint should succeed on the merits. Moreover, Plaintiff believes that the first four factors requested by the precedent of Rathke v. MacFarlane have been illustrated on the Motion for Preliminary Injunction; the fifth factor, that "the balance of the equities favors entering an injunction," can most likely be shown to be met in this case by comparing the potential loss of Plaintiff's property to that of the cost of delay (none of which Plaintiff believes should have been necessary if the City or HOA had facilitated recovery earlier). The sixth Rathke factor, "that the injunction will preserve the status quo pending a trial on the merits," would clearly have been easily met if the City or HOA had allowed access to the property as requested, months ago. Plaintiff's personal property is in jeopardy (which have received valuations in excess of the HOA's insurance limits alone), and assurances of full reimbursement , even of those items deemed 'replaceable' have not yet been satisfactorily provided by parties. Any samples for chemical testing of building materials should be acquired before demolition. Plaintiff believes that the apparent Civil Rights violations should also provide a basis for injunctive relief, and that issues such as these, and others outlined in the complaint, provide clear evidence of injustice that should be addressed before demolition may be allowed; further, that Defendant(s) are clearly attempting to obstruct Plaintiff's rights under U.S. law, including to due process, in deciding these matters.

[CONCLUSION]

For reasons including the foregoing, and relying upon the Verified Complaint, and any other materials presented, Plaintiff believes that this Court facilitate the approval of any other Motions of this Complaint supported hereby, should grant the Motion for a Preliminary Injunction if necessary, and/or order other actions as necessary to prevent destruction of the property without allowing Residents to rightfully recover their property, and/or support the granting of damages as relief.

[Plaintiff believes that time is of the essence in the Replevin Action of this Complaint, and thus has provided this initial brief with the intention of amending later (Rule 15) or as allowed]

Signature of 'Plaintiff': _David W Shaver_ /s/David W Shaver   (PRO SE)   Date: _____3.13.2023_____

Address: _1750 30th St Suite A338, Boulder CO 80301_____   Phone: __303-351-4239__

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 23-cv-00645-NYW

DAVID WILLIAM DACRES SHAVER,

     Plaintiff,

v.

WHITTIER CONDOMINIUMS HOA,

     Defendant.

---

## ORDER TO SHOW CAUSE

---

This matter is before the Court *sua sponte*. Upon review of Plaintiff's "Complaint for Cause of Action : Replevin [Based on JDF 116] (FRCP Rule 64 &/or CRCP 104)" (the "Complaint") [Doc. 1], the Court is not satisfied that Plaintiff has established this Court's subject matter jurisdiction.

A district court has an independent obligation to satisfy itself of its own jurisdiction. *See City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017). Accordingly, a court "may *sua sponte* raise the question of whether there is subject matter jurisdiction 'at any stage in the litigation.'" *Image Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)). A court should not proceed in a case unless it has first assured itself that jurisdiction exists. *See Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005).

"The party invoking federal jurisdiction bears the burden of establishing such jurisdiction as a threshold matter." *Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. 2004).

Plaintiff states that this Court has jurisdiction over this case "pursuant to FRCP 64 or C.R.S. § 13-6-104(1) due in part to personal property claimed having been valued above the limit of lesser courts." [Doc. 1 at 1].[1]  He also states that the Court has jurisdiction pursuant to 28 U.S.C. § 1331 because "the issues involve interpretations of U.S. Constitution's 4th, 5th, and 14th amendments." [*Id.*].[2]

"Under the longstanding well-pleaded complaint rule . . . a suit arises under federal law only when the plaintiff's statement of his own cause of action shows that it is based upon federal law." *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) (quotation omitted); *see also Nicodemus v. Union Pac. Corp.*, 318 F.3d 1231, 1235 (10th Cir. 2003) ("A case arises under federal law if [the] well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.").  It "takes more than a federal element to open the 'arising under' door" of § 1331.  *Empire Healthchoice Assurance, Inc. v McVeigh*, 547 U.S. 677, 701 (2006).  "[T]he Court must analyze the complaint to determine whether it is based on federal law."  *Gwilt v. Harvard Square Ret. & Assisted Living*, 537 F. Supp. 3d 1231, 1237 (D. Colo. 2021).  But in so doing, the Court ignores mere conclusory allegations of jurisdiction.  *Penteco Corp. P'ship--1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991).

---

[1] Because Plaintiff proceeds pro se, the Court thus affords his papers and filings a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).  But the Court cannot and does not act as his advocate, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and applies the same procedural rules and substantive law to Plaintiff as to a represented party.  *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.2 (10th Cir. 2008); *Dodson v. Bd. of Cnty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012).

[2] Plaintiff does not assert that this Court has diversity jurisdiction under 28 U.S.C. § 1332.  *See generally* [Doc. 1].

The Complaint states that "[t]his is an action to recover possession of personal property and/or damages." [Doc. 1 at 1]. It further alleges that on October 19, 2021, a fire occurred at the Whittier Place Condominiums complex and caused damaged Condominium #39, which contains Plaintiff's property. [*Id.*]. Plaintiff alleges that Defendant is wrongfully detaining his personal property "against the Plaintiff's claim of right to possession," [*id.*], and that Defendant has been "unresponsive and obstructive" in Plaintiff's efforts to re-obtain his property. [*Id.* at 4]. Plaintiff claims that "the refusals to allow [him] access to the condominium are in violation of U.S. law in a number of ways." [*Id.*]. Plaintiff seeks the following relief: (1) a Court order directing Defendant to show cause why Plaintiff's property should not be obtained from Defendant and delivered to Plaintiff; (2) that the Court set a show-cause hearing "to make a preliminary determination concerning the right to possession of properties described in the Complaint"; (3) judgment in his favor "for the possession of the property," and (4) costs and attorney's fees. [*Id.* at 5–6].

Upon review of the Complaint, the Court cannot conclude that the allegations are sufficient to establish the Court's jurisdiction under 28 U.S.C. § 1331. Notably, Plaintiff does not plainly or plausibly allege that Defendants violated any federal law, *see generally* [*id.*], and a number of courts have concluded that replevin actions do not, on their face, present a basis for federal question jurisdiction. *See, e.g.*, *Stieber v. Rafnar*, No. C09-0676-JCC, 2009 WL 10676363, at *3 n.3 (W.D. Wash. June 26, 2009); *Clark v. Ford Motor Credit Co., LLC*, No. 13-cv-4242, 2013 WL 5524104, at *1 (E.D.N.Y. Oct. 4, 2013); *Wells Fargo Bank, N.A. v. C.J.B. Holding & Tr. Co., LLC*, No. 2:17-cv-1446, 2017 WL 4541375, at *2 (D.S.C. Oct. 10, 2017). And Rule 64 of the Federal Rules of Civil Procedure does not "extend no limit the subject matter jurisdiction of the United States district courts." *S.E.C. v. Antar*, 120 F. Supp. 2d 431, 439 (D.N.J. 2000), *aff'd*, 44 F. App'x 548 (3d Cir. 2002).

3

While Plaintiff directs the Court to a "Brief in Support of Complaint/Replevin or Motion for Prelim [sic] Injunction," *see* [Doc. 9], which asserts that, *inter alia*, "Plaintiff believes that his . . . U.S. 4th Amendment rights [to his] own property were infringed upon," [*id.* at 3], Plaintiff does not allege that Defendant is a government actor, and it does not appear plainly on the face of the Complaint that it is. *See United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir. 1996) ("The Fourth Amendment protects citizens from unreasonable searches and seizures by government actors. However, Fourth Amendment protection against unreasonable searches and seizures <u>is wholly inapplicable to a search or seizure</u>, even an unreasonable one, <u>effected by a private individual</u> not acting as an agent of the Government or with the participation or knowledge of any governmental official.") (emphasis added). And although Plaintiff states that the issues in this case "involve" interpretation of the Fourth, Fifth, and Fourteenth Amendments, *see* [Doc. 1 at 1], this is insufficient to establish federal subject matter jurisdiction in this case. *See Haywood v. Kansas*, No. 21-2329-JWB, 2022 WL 4743215, at *3 (D. Kan. Oct. 3, 2022) ("[B]road assertions and conclusory references to federal laws are not sufficient to create subject-matter jurisdiction over this lawsuit."); *Blume v. Los Angeles Superior Cts.*, 731 F. App'x 829, 830 (10th Cir. 2018) ("[U]ndeveloped assertions," such as listing federal laws or constitutional provisions, "are insufficient to establish a colorable claim arising under federal law.").

However, although "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction," *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 770 F.3d 944, 947 (10th Cir. 2014), state law claims that raise a substantial question of federal law may be sufficient to establish federal question jurisdiction. *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). "To invoke this so-called 'substantial question' branch of federal question jurisdiction," the party invoking a federal court's

jurisdiction must establish that "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Becker*, 770 F.3d at 947 (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)). This "substantial question" branch of cases has "narrow boundaries," *id.*, and encompasses only a "special and small category" of cases. *Gunn*, 568 U.S. at 258 (emphasis added). Plaintiff does not address any of these factors in his Complaint or Brief in Support, *see* [Doc. 1; Doc. 9], and the Court cannot construct arguments on Plaintiff's behalf. *Hall*, 935 F.3d at 1110; *Lebahn v. Owens*, 813 F.3d 1300, 1308 (10th Cir. 2016).

In sum, the allegations in the Complaint are presently insufficient for the Court to conclude that it has subject matter jurisdiction over this case. Accordingly, it is **ORDERED** that:

(1)   Plaintiff shall **SHOW CAUSE**, in writing, on or before **March 31, 2023**, why this case should not be dismissed without prejudice for lack of federal subject matter jurisdiction; and

(2)   A copy of this Order shall be sent to:

> David William Dacres Shaver
> 1750 30th Street
> #A338
> Boulder, CO 80301

DATED: March 14, 2023                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge

Appellate Case: 23-1197   Document: 010110886277   Date Filed: 07/12/2023   Page: 20



**Plaintiff's Exhibit D**







Plaintiff's Exhibit E

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
03/14/2023
JEFFREY P. COLWELL, CLERK

ABOVE

WEST SIDE

NORTH SIDE

SOUTH SIDE

[Even 'WJE' supplied assessment is self-contradictory , claiming accessible areas in unit 34 below, but same area immediately above, in unit 39 without roof damage, somehow claimed inaccessible!?]

Plaintiff's Exhibit F

**Subject:** Whittier Apartments : Access to Unit(s)?
**From:** David Shaver <davidwshaver@yahoo.com>
**Date:** 10/25/21, 2:10 PM
**To:** "rachel@boulderhoa.com" <rachel@boulderhoa.com>
**Message-ID:** <301363355.617031.1635192657520@mail.yahoo.com>
**MIME-Version:** 1.0
**Content-Type:** text/plain; charset=UTF-8
**Content-Transfer-Encoding:** quoted-printable
**References:** <301363355.617031.1635192657520.ref@mail.yahoo.com>
**X-Mailer:** WebService/1.1.19198 YMailNorrin
**Content-Length:** 1501

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
03/14/2023
JEFFREY P. COLWELL, CLERK

   I was ordered to leave, by an officer outside my door, before I could pick up certain items from the apartment, during the fire on the 19th.  The police department had originally told me that they would allow residents access {first saying within 7 hours to a day, then within two days}, but now tells me that BoulderHOA is the one coordinating access (?).

   The unit I was in, #39, appears to have largely suffered roof damage.  The items that I would be interested in near term retrieval (including my wallet, and phone) were located in a relatively undamaged section (likely accessible via reaching in the side window, or more likely via the balcony).

https://x-in-g.com/Secure/Unit39/

   As a graduate Engineer, having seen extensive overhead video of the damage, and with what mountaineering experience I have, having hiked most of the "14'ers" in colorado (I even left climbing equipment in the unit, in case I had to escape via the balcony! – which in hindsight I probably should've done to retain more of my possessions, not knowing it would take this long), I think I would feel relatively comfortable visiting it in its current condition (and would be quite willing to provide an indemnification or waiver to that effect).

   I pray to God that any residents with any reasonably intact structures are able to obtain access to contents within our units relatively soon!

David William Dacres Shaver

 FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
03/14/2023
JEFFREY P. COLWELL, CLERK

# Autobio * Graphical Resume of:

## DAVID WILLIAM DACRES SHAVER

303-351-4239 * 1750 30th St Suite A 338, Boulder, CO 80301 * IT@COMPUTACOR.COM

Feedback welcome, in any Area or Subject which you are interested, or would Like to Suggest me to Revisit!

[with the intent of continuing, and currently exploring seeking new opportunities!]...

**Owner/Engineer/Manager/Consultant at COMPUTACOR : 3/1999 to present**

* Software Development, Systems Administration, Database Administration exercises and server maintenance * Travelled broadly, acquiring direct, intensive, immersive, low latency familiarization with cultures of, and requirements for day to day living in, over two dozen countries (with a policy of spending at least a month in each, including those whose flags are arrayed on the globe following), visiting places which influenced my life, profession, or that of my ancestors (and encouraging the adoption of technology, computing & the internet) * Company maintenance & registered office duties * Installed, configured, and investigated multiple operating system architectures (Linux [Debian, Ubuntu, Mandriva, SUSE, Knoppix, Morphix, etc], DragonFly, OS X, Windows XP&7), many development and/or scripting environments (including CUDA, OpenCL, XCode, Eclipse, Embarcadero variants, OpenWatcom, Unity3D+'Unreal Engine', etc)) * Investigation and research of topics in health, nutrition and related biochemistry, genetics+genealogy, intellectual property, parallel processing, artificial intelligence, financial engineering, sales, negotiation, interpersonal interaction, government and management, quality and validation, initial forays into electrodynamics, orbital mechanics, energy sources * Hardware and embedded development, from the construction of specialized hybrid compute servers with GPUs using components available to the consumer to exploration of MSP430/firmware devices * Stock market research and investment * Etc.

**Founding Manager, Restoration Engineer, Contractor Management, Procurement, Security at D'Aker Holdings : 1/1994 to present (Renamed)**

I initiated, and voiced strong preferences in favor of choosing to purchase the Huddart Terrace building, with 7500 square feet of space including the basement (which turned out to have been designed by a notable English architect) with potential expansion of our servers, and the available power being key considerations; I then participated in the managing of, updating, refurbishing, refinishing and/or rebuilding of parts of it, including roofing, carpeting, painting, network wiring, lighting, and other construction * Participation in obtaining Denver Landmark status, and environmental survey, plus water tests for it * Researched, procured, designed, supervised the installation of, and maintained a security system including key code entry and proximity cards * Installation of relatively high bandwidth T1 line & router, in temperature controlled server environment which included remote power control * Designed our own lighting fixtures and speced colors to save costs and provide optimum indirect light * Interacted with tenants and government entities * Our interstate merger, coupled with the leasing agents' (associated with one original partner) apparent inability to increase tenant occupancy led to the sale of that building * This company was also involved with the provisioning and procurement of lofts in the IceHouse (though we had to bail on one of them after they first neglected to put in the architectural mods and custom tub that I had asked for [later rectified : I was told that my design for network topology influenced later units], and subsequently announced that they were going to build an elevated parking structure right outside of the deck, and my girlfriend Molly Gibson (whose mother was a prominent Denver realtor, and apparently didn't like the Icehouse in general), both naysaid the deal; we were further glad that our realtor, Jan Nelsen at Devonshire Realty, somehow apparently managed to pull off a simultaneous closing to sell the other one at a profit [after fixing the contradictory plumbing & other quality issues that we pointed out] when we were required to move out of state for our merger {though when I looked for record of it in the deed history, I didn't find it!?}) * Further continued property investment & research, including tax certificates and auctions * Etc. * Also serving in roles: Electrician (designer), Alarm Response Mediator, Landlord, ...

ICEHOUSE

**Original Founder/Owner/Engineer/Manager/Consultant at AstroByte™ : 1/1994 to 3/1999 (Renamed. Mergers w/entities starting in 1/98)**

ASTROBYTE

We began with the intent of focusing on things other than print publishing, and initially approached a number of game development houses with the concept of providing a scriptable animation system for the internet, as well as a real time 3D game engine environment (neither of which seemed to receive a great deal of interest or financial support at the time, though it turns out that some may have been developing their own). Along the way to developing our own products, we also performed custom development for various entities [including enhancing my own work at Quark in exchange for a developer kit, developing system level screen capture utilities (Nintendo,Sega / quasi modular, with potential for significant expansion) for Leland in the hopes that we'd be able to obtain some sort of stock participation in their imminent big merger deal with Midway/WMS/Bally (however the guy we were working with, Michael Abbott, became somewhat standoffish immediately after he accepted the work product, and we pretty much lost contact with him; in later discussions with his cohorts, apparently he somehow had neglected to inform them that we had developed it for them!?), went on to perform very significantly performance enhanced scripting support capabilities for Apple, a template driven Gateway / 'Visual Rainman' for AOL's internal layout format (however, instead of allowing us to upgrade their technology, apparently all they wanted was what I felt was a relatively goofy template export utility (I found out later that the guy we were working with, who was evaluating our technology, Brad Zions, Director, AOL International, was apparently educated as a Biologist!), so we went on to help invent the internet instead!; I further performed unfinanced consulting for my girlfriends's high end audio company 'Fidelity Communications'].

BeyondPress (v1-4)

- Member of a team which developed BeyondPress (multiple versions), the first WYSIWYG web authoring and repurposing tool for professional magazines and newspapers / &LL3pFwk.v3+.* Code: graphics/image/editing+layout * Org&C+CGI's * Scripts * Contract development & consulting.* Database design, development, management+implementation, &publishing (all Web+SQL). * Systems+Database administration * Development 3D game engine (which I developed the real time assembly texture mapping, depth shading for), a version provided to Apple for shipment with OpenDoc distributions which allowed for multiple nested parts, before we became aware of QuickDraw 3D, more than one year before its release {and 20 years before Apple's 'Metal' API}.* Purchasing * Travel: some shows, intl. dists .. * Negotiation/Inv^A * A bunch of other stuff. * Architected & managed the implementation of a web based shopping cart style system incorporating order entry, distributor handling, product fulfillment, user registrations, user news mailings, and protected support areas; Later extended to 'XTSource' including third party product sales, initially asking relatively low 25% margins. * Designed and implemented serialization and network copy protection. * Managed servers (Mac, NT; DNS / BIND, DHCP, HTTP, FTP, SMTP, SQL, etc) and procured T1/ISDN internet access and provisioning, DNS/domain registration, router maintenance, and access; initially also installed software & fonts, occasionally handled difficult tech support questions, etc. * Obtained shared company membership(s) in a local fitness club. * Attended trade shows, performed purchasing [including equipment and software], visited overseas distributors, and oversaw / negotiated contracts for distribution, consultation, and mergers, etc. * Assisted in starting a European branch (Astrobyte Europe, LTD), and associated banking and other activity.* Reviewed / proofread documentation. We later also developed a specialized variation of BeyondPress customized for Koyosha in the Japanese market, etc.

Starting with 3-4 founders, [I had first come up with the name Acrobyte, influenced by my mother's reportedly ancestral D'acre family origins, but we were prompted at one point to rename, by another company (who I may not be allowed to name), which apparently considered that ours was too similar to one of their product identities] we eventually had up to a dozen employees, full and part time, several which were engineers, reporting to me in certain capacities, before merger.

CyberPress (via Extensis)

Custom development or involvement: Quark Leland (later Midway, now WMS) Masque® Apple AOL Koyosha Extensis

Metrowerks Test Site

[Astrobyte spoke of mergers/sales, first w/Quark (who did not make us what our books said would be an offer in the very reasonable range for a profitable company of our sales level, or a few other ways we attempted to value things, and did not appear to be willing to offer us anything above a 5% royalty rate, if at all), then Extensis (whose offer looked much fairer given our revenues, which were just reaching the seven figure mark even without our soon to be released Windows version)] : **Extensis'** financiers were Hambrecht and Quist, (who, research later shows, also worked with Apple, Netscape, Amazon, Adobe, Google, AutoDesk, and the less fortunate CP/M[+KPMG]. We were required to move to Oregon as a condition of the agreement (despite my protests to the contrary), though I can count on one hand the number of times those we had dealt with actually visited my office after I moved out there. They wrote that merger stock consideration should be worth over $10 a share at IPO within several months (even without the merger, claiming a 100M+ IPO valuation) and at over $25 a share within a few years. Although market trends remained similar, our engineering team ended up being cut in more than half from expectations given, and, claiming that this would better enable the goals of the merger to be met, founders were divided, with one going into management, two others told to work in engineering positions (refusing to make my suggested offer and incentives to our MSWindows specialist {instead paying us more per hour to do his work}). Despite having to manage engineering and QA their way [we had been testing using our entire engineering team & technical support in off hours, while they used a single full time individual without an engineering education who had worked for competing companies], which didn't appear to enhance overall efficiency, time to market, or product quality {instead of using engineers in their off hours, they had a single specialist, who I think had conflicts of interest, having worked at competing companies in the past}, we completed a new version of "BeyondPress" w/DHTML+CSS and produced a wholly new MSWindows version, the size+-complexity of QuarkXPress, within the year. Strategic concepts and scenarios that I provided prior to merger weren't adopted, contrary to upfront agreement provided by senior management, and despite my own later reiterations {instead cannibalizing our resources to feed alternates which appeared to me incapable of generating the revenue to justify their claimed valuation}. [Contradictional] Management generally appeared to be unable or unwilling to adhere to many goals set, or agreements made, entirely (employing only founding Astrobyte employees by the end of the first year, and even terminating my employment from my own, albeit merged company, at about that time (following actions by a colleague who had previously been employed by one of our competitors, and further admitting that at least one of my partners had backed them in their decision)), claiming that they didn't think I was happy there, despite their original claims of retaining all essential personnel, & destroying our relatively lucrative Japanese product guarantees (enough to cover our salaries), cancelled without soliciting my input or even inviting me to the meetings, and apparently without anything to replace them with). Coupled with requiring replacement of our serialization & removal of our own copy protection, these apparently diminished sales. They also did things like asking me to disable the network copy protection on our QuarkXPress products, and assigning myself and another ex Quark employee copies with the same serial number. Quark later announced that they would be developing some level of their own HTML export capabilities, despite their apparent lack of interest in negotiations with us, which had reportedly taken into account the results of polls of their service plus' customers. Meetings often had more managers than people doing things. We also found out that Adobe had decided to hire senior personnel from Quark, and then later from Extensis, even though they were (minority~10%) stockholders and reportedly on the board (which had given a valuation for our merger which was not met). Extensis' IPO never occurred (nor did there appear to be much sincere effort to prepare for one); instead, a belated merger with ImageX [WA] and who later research indicates had some management from Quark's competitors, although that may be a coincidence influenced by the state that they were in, and even West Point alumni. I attempted to alert senior management once, but they didn't return my call), continuing to reduce both valuation (with the stock price plummeting rapidly to <1% of their claims to us), and their XTension products [Multiple employees incl. engineers=>Adobe (although they were a minority stockholder apparently with board representation, they began hiring engineers away even while leaders were still claiming to be attempting to go public!), later Apple, mergers/assets => ImageX => Kinkos => Fedex => Celartem(!?) of Japan].





'3DWorld' optimized for 68K &PowerPC (shown on G4 1.25 @1695 frames per second!)

---

### Software Engineer, Founder, Consultant at Software Forge : 1990 to 1998

- I voluntarily originated, and developed what became the Macintosh version of the 'Intermission' Screen Saver engine (making it the first cross platform screen saver package), influenced by a colleague's creation of a shareware screen package that had derived from my prior work in drivers, including sound and UI API's [in C, and hand optimized assembly language], system level trap patching, system level security, multitasking, supporting multiple modules + monitors, and other modules, and ported (mostly) / rewrote (some) [and debugged! (occasionally)] associated Windows based sprite and compression engines. My original stated preference for a minimum percentage of gross revenues was not implemented. Originally also used as a test vehicle for experimental exercises of our engineering skills, after the Canadian Delrina corporation took it over, it was primarily used for animated cartoon packages. They further also required me to assist them in degrading the quality of the product graphics, despite my stated preferences to the contrary, and I was even asked to teach the new management (Todd Gilbertsen; also dealing with Jack Brummet/QA) how to use their own product, TMON. Also used in (~)'Opus & Bill', The Far Side, Flintstones, Dilbert Screen Saver Collection(s)*, (*)'Star Wars Screen Entertainment', [In association with {Ant Software} + {(ICOM[WA]=> (~)Amaze[WA] + Delrina[CN])=>Viacom & ((*)LucasArts + Presage[CA])}=>Symantec[OR], etc.} & including direct contact/involvement with most at times.  I was blown to Seattle and California]. Members of ICOM(+) later went on to work on MS/DirectX=sound,QuickTime. I was never approached for a PPC version (though if royalties are any indication, the 68k versions weren't especially profitable anyhow, never nearing hype; at least it managed to pay for the equipment used to develop on, if not pay for PPC hardware to develop further revisions with! {probably would've had to renegotiate given the discrepancies between their claims and financial reality}), and it was (much) later indicated that Symantec had simply decided to discontinue ("kill") the product line, post merger, without involving me {%}. Although I had been led to believe that I would receive royalties for all subsequent Mac products using the sprite package, Anthony Andersen at Ant Software instead reportedly switched to Microsoft's emulation libraries as soon as they became available, and later was effectively absorbed into Masque apparently as a stockless employee, indicating that they're not using the sprite library anymore anyhow. Amaze personnel left Symantec and reformed as Amaze Entertainment, whom sources indicate used the same logo [assets=>F9=>GLU Mobile], again providing entertainment software, though I haven't yet been approached for any code licenses ;-?.

   

Intermission (Original: ICOM)    Opus 'n Bill [Gates] (Original)    Dilbert    The Far Side

- Developed / ported the Macintosh version of Solitaire Antics(TM) (based on same engines, also used in other products I games, such as, reportedly, 'Shadows of Cairn', 'Craps' [WSOP]...) * Adapted & maintained third party installer. * Rewrote my 68k sprite assembly code in C for PowerPC adaptation & merged with cross platform capabilities into Windows code base (%) [In association with {Ant Software} + {Masque}][CO]] * {(%) Royalty payments stopped shortly thereafter...} * etc.

- AKA 'ScreenPeace', (~)later 'Intermission' was used to make fun of Bill Gates (subsequently, though it may be coincidental, screen savers were shortly afterwards added to the OS) & to depict a penguin w/shotgun shooting down (lawsuit provoking) toasters.

   

Intermission (Later: Delrina)    Opus 'n Bill (After Toaster Lawsuit)    Star Wars Screen Entertainment    Flintstones

 

Custom development or involvement with: Ant Software  ICOM  Delrina  ~Amaze LucasArts™

---

### QA/Tech Support/Software Engineer/Senior Software Engineer at Quark : 5/1987 to 1/1994 (Renamed)

(Primarily in Research and Development for 'QuarkXPress'(TM) Mac and code derivatives / QPS)

- Designed/architected and led the development of the scripting system + testing scripts & support / OSA. * etc.
- Taught workshops: color overlap control (to customers), scripting, low level software debugging (internally).
- Network communication (+asynchronous, realtime during interrupt; used as basis for 'QPS'(TM))(+).
- Scanner software (+GPIB) & compression of files * Auto-save / backup * 'Intelligent' text scrolling. (Development for the very first slide scanner, Barneyscan, which also launched "Adobe Photoshop").
- Floating palette layer management system & miniature graphics * Window tiling, stacking.
- Development on the very first XTensions (hyphenation), adding the ability to have User Interfaces at all.



QuarkXPress (v1-3.2) QPS, CopyDesk, etc.

- Printing : Overlap adjustment system + UI & font gen., blends, formulas, Color Compensation/Dot Gain UI.
- QA+customer+educational+technical support, including some conferences/trade shows & travel.
- Parsing dictionaries, and compiling mathematical formula descriptions + wysiwyg editing UIs.
  {Teaching myself Macintosh programming was initiated & required in order to get to R&D from the filing, courier, warehouse and technical support duties to which I was originally assigned [even though I had applied to a job advertisement seeking 'Programmers', they apparently thought that I needed to prove computation and/or Turing's theory of completeness by demonstrating my skills still worked in the latest fashion in languages; I purchased my own compiler and system reference manuals to do so]. I helped the Tech support Manager to write the configuration / installation utility in while attempting to migrate to the software development team. Originated the dictionary editor, network communications, palettes+handling, and misc. items myself; other items were designed and developed upon some assignation and directive}. Contributions to portions of features or team reworkings in other areas of the product, such as nonsimple polygons, drag and drop text, text obstruction runaround, many optimizations and bug fixes (also demonstrated real time transformation of 3D spline objects to management in 1989). mathematical formula layout code incorporated multiple nested palettes with quantities of formula types, also allowing for extensive table creation and nesting, along with other extended layout features. I was also asked to design and develop network code to allow for serialized copy protection (which I was told resulted in very significantly increased sales {including those generated by an "amnesty" program}) further adapting that to support network communcations (tested by transferring document contents between engineer's copies of the product), and to maintain the code for the third party disk based copy protection. Alas, repeated representations made that engineers would share in the financial success or sale of the company (and someone else has told me stock) never really appeared to materialize out significantly, despite over an order of magnitude increase in employees. Intimations that we should work yet harder (over 100 hours a week at times!) apparently in order that more there might be more profit to be shareable appeared to be met by the american public buying up our competitors shares (in addition to competitors and the operating system vendors notably assimilating features outright!) seemingly in order that there might be an even horse race or something. They also appeared to me to have a strange propensity to put people of lesser technical talent in charge of things. They seemed to prefer that we put anything outstanding 'under the hood' so that third party XTension developers could take advantage of them, rather than shipping them in the main product. Prior employees there had led me to believe that their relatively low compensation was as a result of their failed QC10 hard drive product, yet the company's success appeared to lead to the company founder buying up properties in England, worshipping a statue of Darth Vader in his office and even speaking of eliminating profit sharing instead. After working there for several years, and despite the fact that I had told them that I thought they should be paying better, I was still making less financially per hour than I had when consulting in my teens (nor relative to the difficulty of getting into engineering school either, though at least they covered the cost of computer hardware used!), and the non financial incentives, most especially the learning involved, were no longer enchanting in the same manner either (in addition to the apparently failed attempt to sell out to Claris, the strange issues with Broderbund's 'Zeus', de-emphasising Macintosh Development {particularly given that I am descended from the Macintosh clan of Scotland}, reneging on their grants to put our names in the manual (after version 2, without letting us know in advance, after working on the next version for over a year; it was indicated to me at the time that this was because they didn't want their engineers hired away, so after others requested it, I put copies of individual developer's images in an easter egg in the about box {which were apparently largely removed by the very next minor revision after we had left!, though later versions showed images of turbaned people of India in our places}), and the repeated indications that our jobs might be outsourced overseas). The product was popularly considered the foremost desktop publishing application at the time. After completing the scripting capabilities (which supports any OSA compatible scripting language, currently including Ruby, Perl, JavaScript, and a number of others, the stand alone code segments for which themselves, upon completion, comprising nearly 20% of the object size of the product, having developed the vast majority of this at the time myself), and given further circumstances including Quark's apparent lack of value for my work, Apple's decision to transition to the PPC, as well as the departure of Apple's scripting team, I thought and felt that an exit would be prudent. The first phone list that I saw had an employee count in the 30's, (only about a dozen employees when I started, with 5 engineers {one part time} when I began developing) the last well over 400; in the neighborhood of 10-15% engineers, on few different teams and platforms, with a shared code base, reportedly around an order of magnitude more employees after company properties were relocated to Persian areas (I'm told that they decided to relocate development to historically Persian areas of India after an entire team apparently failed to effectively reproduce web page exporting capabilities {which we had offered to provide them in the above Astrobyte merger : they have further even copied our marketing slogan printed on our t-shirts "reinvent your content" outright!}, plus the original founder sold out, and the entire remaining Macintosh team was reportedly subsequently terminated). Reports after 'Platinum Equity' buyout indicate that QuarkXPress alone has eventually obtained an installed base of over 3 million units, up to 9 revisions, billions in revenues.

Custom development or involvement with: Apple National Instruments Barneyscan Metrowerks Test Site (Indirectly: Linotronic Linotronic)

Enrollment in the University of Colorado's engineering program appeared likely to alleviate some of the concerns that potential customers without the capability to evaluate my skills themselves had raised (though in subsequent experience I have found that if I only bring the education up when asked, it appears that the concern can be an excuse on the part of the customer, and it hasn't seemed to help much). Coursework ranged from General Core Engineering (Physics, Maths [including Probability+Statistics, Linear Algebra, Calculus I-III, Numerical Analysis, DiffEQ]), Electrical and Computer Engineering (Theoretical Foundations of Science, Compiler Design, System Design, Artificial Intelligence (+senior project : ORAMA [Operating Room Anaesthesiology Operating Assistant : AI / 'Expert System']), (Massively) Parallel Processing, Circuits), M.E.: Graphics, Speechmaking... (Metro State U : General Chemistry, Weight Training, IT/Unix +CS (Algorithm Analysis, Systems), finance, ...). My assigned dorm mate when I first started attending CU Boulder was Joe Schaak.

**Consultant/Founder/CTO Self Employed => Moebius Computer Consulting (AKA Mobius Software): 1980 to 1987**

- Originated a low level WYSIWYG Sector Editor, inc. VTOC {Entirely in 6502 assembly}.
- Whole Disk Compression [Awarded. 6502] *Graphic Editing, Sprites * Negotiated Consulting Contracts.
- Wrote/Adapted Bulletin Board Software (including 6502 assembly level Serial Interrupt Drivers).
- Driving of modems with scripted commands *Utilities for Telecommunications, Drives, Graphics, WP..
  An uncle, alum of the South African military, prequalified clients at a local community college:
- Development of a Statistical Analysis program, intrinsic to a Doctoral Candidate's Thesis.
  [Each time he brought it back for upgrades, he had replaced my name in the comments with his]
- Designed a Database System, used in contract for Real Estate Multi-Listings {CP/M : TP : Z80}.
  [Alas, the monopolistic multi listings service of the day apparently wasn't conducive to full payment]
- Developed Student Grade Tracking + Sorting DBMS, later associated Dial Up Telecom BBS version.
  Incidental lessons learned included strategies for coping with clients who repeatedly changed their specifications mid-stream, made partial payments, or didn't pay at all, who repeatedly took credit for my work, or threatened use of lower cost competitors for upgraded versions.
  I found that teachers appeared to appreciate it if I volunteered programs, or were willing to accept them instead of homework:
- Originated on perceived need: Cryptogram / character 'jumble' I substitution entry + generator.
- General Purpose Multiple Choice Test Presentation and Scoring software * Flag drawing * Etc.
  Hosted as SYSOP 2 or 3 different flavors of Bulletin Board Systems (Electronic Publishing + Social Networking), including writing my own drivers, terminal programs, utilities, upgrades and front ends to existing BBSs, advertising it, and hosting the area's first 1200 baud system on a dedicated line.
  Near the end of my Apple ][ usage, I made up an entire disk of utilities and games that I was willing to provide as shareware to the local Apple Pi user's group, which they had indicated they were going to send out, but it's not clear to me that they ended up distributing it, as I had included my phone number on it, and didn't receive any calls.
- serving in roles: President, Custom/Contract Developer, SYSOP, Philanthropist?

Some representative sample projects:

Sector Editor Drive Copier

Student Grading & Handicap Profiling Multiple Choice Test Generator

Pro-Dialer Mobius Game

Custom development or involvement with: Jefferson County Schools Arapahoe Community College ...

**Waiter/Cook/Server/Arcade at Casa Bonita : 1985 to 1986 (Billing themselves as "One of America's top ten roadside attractions.")**

- Mexican, American foods / mass preparation+delivery (incl. condiments+utensils), cleaning, frying. * Training of newer employees,

order fulfillment & customer satisfaction + arcade coin collection. * Napkin rolling. Uniforms. Buttons. Time Cards. Sopaipillas. * Haven't been the cliff diver yet.

[I thought that the varied and intense customer interaction should help to improve my people skills. Shared tips. One year's service was considered unusually long, and awarded, at the time. Service for mass quantities of people; multiple production assembly lines, and simultaneous live shows. Minimal discounts. According to other employees, management reportedly utilized lie detector tests under certain circumstances. Said to be under British ownership at the time; now reportedly owned by 'Star Buffet' of Oregon. Reportedly the largest restaurant in the world at the time, and still apparently in the top 10]



**Wrangler at Bear Basin Ranch : Less than two weeks in spring / summer of 1982**



- Participating in, and even later leading trail rides, myself with neophytes (incl. my brother) * Chopping wood * Solo excursions * Rounding up horses at ~4 am prior to them, and of course: * Shoveling it.

[My grandmother put myself and my brother in touch with these people. After days of solo excursions and rides with what I seem to recall being told was a quarter horse that they had provided me with named "Captain" (with a light complected dappled appearance suggestive of an appaloosa, but who I was much later informed was a full blooded arabian) who I appreciated, and winning at tactical/strategic games such as "Ogre" and "GEV" with other ranch hands after hours, the owning duo's male half made a surprise arrival; apparently both made of stern stuff, and determined to apply it (I had extended upon someone else's use of a log section for chopping, which he declared was reserved for seating {and I had even checked that it was OK with another employee in advance}!), which I quickly replaced with another. He later solicited a round of jokes from all and sundry, none of which he laughed at, then adamantly declared that we were too young to engage in the reportedly bare activities that were about to occur in Bear Basin's sauna (later learning that we were reportedly also too young at the time for their insurance policy! {not to mention Colorado's outfitter regulations, which may not have been applicable yet anyhow}); we left quite shortly thereafter. The pace of activities at the ranch did not quite appear to mesh up with skills or values which we had been taught for participation in high speed precision drill teams either. I didn't really have opportunity to sell any consulting skills, and was disappointed by the way it had culminated... Ah, lessons of Custer county!]



**Organisation Member at Westernaires : 1979 to 1986 (then Billing themselves as "The best precision mounted drill team at speed in the world.")**



- Exhibitions at local (+stock show), interstate venues * Bullwhips training * Wrangler Division member.
- Harnessed: Carts, Chariots [Leadership is done from behind], Roman Riding [Standing on top] {Shetlands}.
- 'Red' Division: 'Indians' [Bareback], then Cavalry [MacLellan] reenactment teams * Yearly ticket sales quotas.
- Equitation skill development and competition * Also serving in roles: Equestrian, Wrangler, Performer, Sales.



- An english teacher was one of the more computer literate of the faculty at Golden High school, and asked me to be a teacher's assistant, manning one of the computer labs. Although apparently he mostly wanted me to assist his students with their word processing skills (ok, sometimes I had the lab to myself for Pascal development, though they were using the UCSD interpreter, and didn't have the Turbo Pascal compiler that I was using at home on CP/M), he also suggested that I enter the regional (with multiple local states being invited) programming competitions (supported by the University of Denver's Mathematics and Computer Science department, though it looks like after they put someone from India in charge they first switched to events sponsored by HP and sponsored by Microsoft from the Apple hardware that I had competed on, then stopped having them not long after he also was put in chsarge of their new CS/Engineering program); I programmed solo, though one of the more athletically inclined students who said he was just "geeking out" went along to observe. I managed to take second place (with insufficient time {and no internet available to do research!} in what felt to me like a cramped schedule to finish all of their what felt like mathematically oriented problems (alas no style bonus points for UI design)); a team of two guys taking first (being credited for solving one more problem than I). Alas, apparently prizes for winning disappointingly didn't include trophies, plaques, or scholarships (unlike athletics in those days!?)...
- I chose to approach Lakewood's local computer store (as Golden did not have one at the time) for my high school's required "Day on the Job" program, obtaining days of experience with consumer level retailing.
- Near the end of high school, one of my classmates, whose father developed software, challenged me to what was effectively an assembly level duel or contest {using 'Merlin'} for a duration of days (timed to the instruction cycle); even though his brother also somehow got involved despite a promise that he wouldn't, in telling him how many instruction cycles I had achieved ahead of time, I did manage to win by a substantial margin, to their expressed chagrin and consternation or indignation at the time, with later attempts at denial plus claiming further that they let me win (I can say that it did bear some similarity to serial interrupt drivers that I had developed for telecom projects, and I beat them by considerably less of a percentage in margin than performance enhancements which I later delivered on Apple's own system code, for example. I later heard that they went on to develop related telecom software themselves! {even though it sounds like they profited thereby, I haven't received royalties from that (yet) either ;-?}).


David's Apple][e, with Drive controller for "Rana Elite"s, Serial card for Prometheus Promodem, Microsoft 'Premium' Softcard][e CP/M card (running Turbo Pascal}

- My uncle was responsible for the computer lab at a local community college, and would sometimes forward me requests for custom software creation, either dealing directly with the college, or from people who were looking for solutions (a variety of which are listed above).
- My mother enrolled me in  Junior Achievement, where I was the (elected) leader's assistant; the business we set up manufactured and sold these rolling "penguin on stick"s, sometimes door to door, as we also had to do for our annual

  𝒲 Westernaires stock show ticket sales quotas. I had also tried a light newspaper delivery route for a brief period.

- I took a Pascal programming class through Adult Education between Junior High and High School, also taking a typing class through WheatRidge High School's summer school program.
- I found that some of my teachers would accept programs in place of homework assignments, or as contributions; I wrote programs for my French, Social Studies, and Language Arts teachers. I used the computers in the Colorado School of Mines' Green Center after hours until they restricted access. Around the end of Junior High School, my mother and my French teacher got together and arranged to obtain an Apple ][e through his educational discount.
- My grandmother got me involved in Yoga at an early age, and I have had experience with a handful of different flavors; I can put my foot behind my head if I've stretched recently!...
- The Junior High school that I attended had some Apple ][s (a few in the library, available to students in the mornings; though first come, first served!), as well as a Commodore "Pet" computer. I played chess, and when computers started to become competitive at that, it encouraged my interest in them.
- Back in the Rocky Mountains, where we lived surrounded by forest (originally in a cabin), and consuming a diet largely limited to natural sources, I attended both Elementary School, and "Open Living School" for a year, with brief computer contact at both. I can recall being asked to write a program on an Apple ][ at one point near graduation from 6th grade.
- My father worked for the U.S. Government, and we transferred to Germany when I was three years old, staying there for around three years, where I attended both U.S. and German style kindergartens in Wixhausen, near Darmstadt, in the area where the GSI Helmholtz Center for {Nuclear} Physics Research, and Frankenstein Castle are located). We also managed to visit many countries of what is now considered the 🇪🇺 EU.





| Operating Systems: | | | |
|---|---|---|---|
| Unix / BSD : Mac OS X, DragonFly | Apple DOS | Mac OS Classic | Linux: [Debian, Ubuntu, Knoppix, SUSE, Morphix, Mandriva, ...] |



| Windows 98 / 2000 / NT [+Server] / XP / 7 | Some: MS-DOS, DEC PDP / VAX / VMS | Etc. (some use of a number of others) |
|---|---|---|

**Languages:**

| 1:Primary | C / C++ (decades) | Pascal | BASIC | PostScript | Asm/Assembly: * 6502 * 68k * PPC | |
|---|---|---|---|---|---|---|
| 2:Secondary | Lisp / Scheme | SQL | Flash | Objective C | (Parallel) FORTRAN | C++0x |
| §:Tertiary | 80X86 | OpenCL [& Cuda] | Etc. (some use of a number of others) | | | |

I also took formal classes in French for six years, which assists with comprehension in other countries utilizing latin related languages. I generally like to learn new languages and environments, and adjustment to or productivity in them can be relatively quick.

**Some Honors/Awards/Facts:** (in addition to those won by a number of the products mentioned above)

* Certified Scuba Diver SSI PADI ANDI (Nitrox) * Red Belt Tae Kwon Do

**Golden High:**
 First Place, Industrial Arts Fair, whole Disk Compression, written entirely in 6502 Assembly [Merlin].
 Second place, solo for teams of <=3, Regional [multi-state] Programming Competition w/D.U.[NPO].
 Lettered in Forensics : Debate, primarily environmental quality topics. "Extemporaneous speaking".
 Teacher's Assistant: For both French and English teachers (managed one of the computing labs).
 Asked to be the official videographer for the high school's public choir performances.
 Junior Achievement: Small business emulation; multiple small awards I pins (performance related).
**Bell Junior:**
 Orchestra: Second Chair, Cello. Bowling League: Team & Individual awards (including over 200).
 Teacher's Assistant: for the school's "Language Arts" Teacher.
 Member, "TrailBurners": Hiking, incl. many >="14'ers" in Colorado, multi day trips incl. Grand Canyon.
**Ralston Elementary:**
 Swim Team: Multiple trophies or ribbons for medley relay and breaststroke (.1s f/state qualifying).
 Scouts: Pinewood Derby; third place, race performance of constructed unique automobile design.
 Sent to "Gifted and Talented" Art Camp; after creating unique & original works during art classes/3D.
 {One year spent attending the "Open Living School" alternate education institution in Evergreen.
 While there, I was awarded a Fire Department plaque for artwork depicting 3D fire fighting helicopter}
 Member of choir group, including field trips such as performing at external care facilities.
 Read an average of three books a day while participating in a readathon battling Muscular Dystrophy.

**Kindergarten in Germany (German & English variants):** [near Frankenstein Castle : components!]

**Born: Colorado, U.S.A.** (Parents met in Boulder Colorado; their families spent time in Washington and Kansas)

David Hiking on the Matterhorn

  

A Mitchel Crest    A Dacre Crest    A Lyman Crest

Reputed Likely Ancestral Homes and Lodgings:

    

Acre, Israel (lost after Crusades?*) — Dacres Hotel (WA) (Lost with ranch during Depression) — Tower of David in Jerusalem (say some sources) — Our Cabin in Golden — Macintosh Moy Hall (Before its reputed destruction #, and rebuilding) — Dacre Castle (Apparently taken by non 'Jacobites', along with a number of others *) — Hermitage Castle (Reportedly also taken by non 'Jacobites' *)

UNDER CONSTRUCTION
(Still researching ancestry+: orphaning, conflicts, record issues)

      

Egyptian Pyramids (via Ireland?) — Mayan Multiprocessors? (Cherokee migration:legends?) — Shaver/Palmer place in Oklahoma — Dumbarton Castle (reputedly the origin of the Mitchel family name) — Fogarty Castle # (shown reportedly rebuilt to some extent along the same design) — Naworth Castle * — Greystoke Castle *

This Document Created Primarily Using Astrobyte's BeyondPress, Within QuarkXPress 3 for Macintosh

Bill Hambrecht – Wikipedia                                                                                                                       2/3/23, 7:46 AM

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
03/14/2023
JEFFREY P. COLWELL, CLERK

Plaintiff's Exhibit H



**WIKIPEDIA**
The Free Encyclopedia

# Bill Hambrecht

**William R. Hambrecht** (born 1935) is an American investment banker and chairman of WR Hambrecht + Co which he founded in 1998. He helped persuade Google to use an Internet-based auction for their initial public offering (IPO) in 2004, instead of a more traditional method using banks and other financial companies to find buyers. He is credited with popularizing this "OpenIPO" model, using Dutch auctions to allow anyone, not just investing insiders, to buy stock in an IPO, potentially raising more money for startups. Some of the companies he has helped have an IPO like this include Overstock.com, Ravenswood Winery, Andover.net and Salon.com.[1][2]

Hambrecht is also credited as one of the first major investment bankers to recognize the value of technology and biotech companies, helping to take Apple Computer, Genentech and Adobe Systems public in the 1980s with his earlier San Francisco-based company Hambrecht & Quist, which he founded in 1968 and which also backed the IPOs of Netscape, MP3.com, and Amazon.com. The firm was bought by Chase Manhattan in 1999.[3] In 1997, he sponsored the foundation of BOOM Securities (H.K.) Limited.[4]

| William R. Hambrecht | |
|---|---|
|  | |
| **Born** | 1935 (age 87–88) |
| **Education** | Princeton University, AB, History |
| **Occupation** | Investment banker |
| **Spouse** | Sally R. Hambrecht |
| **Children** | 5 |

Hambrect is a 1957 graduate of Princeton University, where he received an A.B. in History. He has been listed as one of the top political donors in the country, giving mostly to Democratic candidates, and credits Nancy Pelosi, whom he met in the 1970s, with inspiring him to get involved in politics.[5]

Hambrecht is on the board of trustees of the American University of Beirut,[6] Lebanon.[7] He was on the Motorola board of directors from 2008 to 2011 and the AOL Inc. board of directors from December 2010 to February 2011.[8]

## Professional football

In the 1980s Hambrecht was a minority investor in the Oakland Invaders, a charter member of the failed United States Football League.[2]

| | Private | Public |
|---|---|---|
| **Adobe Ventures L.P. Equity Investments** | | |
| Engage, Inc. | | X |
| ImageX.com, Inc. | | X |
| Managing Editor Software, Inc. | X | |
| | | |
| **Adobe Ventures II, L.P. Equity Investments** | | |
| DigitalThink, Inc. | | X |
| Engage, Inc. | | X |
| HAHT Software, Inc. | X | |
| ImageX.com, Inc. | | X |
| PictureIQ Corporation | X | |
| Salon Media Group, Inc. (formerly Salon.com) | | X |
| Virage, Inc. | | X |
| | | |
| **Adobe Ventures III, L.P. Equity Investments** | | |
| AvantGo, Inc. | | X |
| Biz 360, Inc. | X | |
| Builders Information Group, Inc. | X | |
| Covalent Technologies, Inc. | X | |
| Digital Fountain | X | |
| DigitalThink, Inc. | | X |
| Engage, Inc. | | X |
| PictureIQ Corporation | X | |
| Sendmail, Inc. | X | |
| Shutterfly, Inc. | X | |
| Slam Dunk Networks, Inc. | X | |
| | | |
| **Adobe Ventures IV, L.P. Equity Investments** | | |
| BAM Software, Inc. | X | |
| Biz 360, Inc. | X | |
| Cardiff Software, Inc. | X | |
| Convio, Inc. | X | |
| Convalent Technologies, Inc. | X | |
| Digital Fountain | X | |
| HAHT Software, Inc. | X | |
| Kontiki, Inc. | X | |
| Pervasive Security Systems, Inc. | X | |
| Picture IQ Corporation | X | |
| Sendmail, Inc. | X | |
| Shutterfly, Inc. | X | |
| TuVox, Inc. | X | |

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
03/14/2023
JEFFREY P. COLWELL, CLERK

We intend to continue investing in new markets through limited partnerships as well as through direct investments.

## PRODUCT DEVELOPMENT

Since the personal computer and enterprise software industries are characterized by rapid technological change, a continuous high level of expenditures is required for the enhancement of existing products and the development of new products. We primarily develop our software internally. We occasionally acquire products developed by others by purchasing the stock or assets of the business entity that held ownership rights to the technology. In other instances, we have licensed or purchased the intellectual property ownership rights of programs developed by others with license or technology transfer agreements that may obligate us to pay royalties, typically based on a percentage of the revenues generated by those programs.

Case 1:23-cv-00645-NYW   Document 18-6   Filed 03/14/23   Page 2 of 2
Plaintiff's Exhibit I: Page 2 of 2
Appellate Case: 23-1137   Document: 010110880277   Date Filed: 07/12/2023   Page: 31

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-K

(Mark one)

**[X]**     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended November 29, 2002

**or**

**[ ]**     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 0-15175

# ADOBE SYSTEMS INCORPORATED

*(Exact name of registrant as specified in its charter)*

| **Delaware** | **77-0019522** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**345 Park Avenue, San Jose, California 95110-2704**
*(Address of principal executive offices)*

**Registrant's telephone number, including area code: (408) 536-6000**

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act: Common Stock**

Indicate by checkmark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 (the "Act") during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X]    No [ ]

Indicate by checkmark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes [X]    No [ ]

The aggregate market value of the registrant's common stock, $0.0001 par value per share, held by non-affiliates of the registrant on May 31, 2002, the last business day of the registrant's most recently completed second fiscal quarter, was $1,462,142,091 (based on the closing sales price of the registrant's common stock on that date). Shares of the registrant's common stock held by each officer and director and each person who owns 5% or more of the outstanding common stock of the registrant have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. As of January 24, 2003, 231,074,795 shares of the registrant's common stock, $.0001 par value per share, were issued and outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Proxy Statement for the 2003 Annual Meeting of Stockholders (the "Proxy Statement"), to be filed within 120 days of the end of the fiscal year ended November 29, 2002, are incorporated by reference in Part III hereof. Except with respect to information specifically incorporated by reference in this Form 10-K, the Proxy Statement is not deemed to be filed as part hereof.

| ☐District Court ☐Boulder County ☐Boulder Municipal Court | **FILED** |
|---|---|
| ■Federal Court | **UNITED STATES DISTRICT COURT** |
| Address:901 19th Street, Denver, CO 80294 | **DENVER, COLORADO** |
| | **03/31/2023** |
| Plaintiff:        David William Dacres Shaver | **JEFFREY P. COLWELL, CLERK** |
| Vs. Defendant(s):   Whittier Condominiums HOA | |
| (City of Boulder has been sent Notice) | **Δ COURT USE ONLY Δ** |
| 'Pro Se'Party/Not member of Colorado Bar (Name and Address) | Case Number: |
| David William Dacres Shaver | |
| 1750 30th St Suite A338, Boulder CO 80301 | **23-cv-00645-NYW** |
| Phone Number: 303-351-4239 eMail:davidwshaver@yahoo.com | |

### [V1.49] Response to Judicial Order to Show Cause {of Federal Jurisdiction} of 3/14 [Doc#16]

Plaintiff, in response to this Court's 'Order to Show Cause' WRT Jurisdiction of 3/14, submits the following response demonstrating why he believes this Court should have subject matter jurisdiction over this case. Although analys(e)s of the Order of 3/14 appear(s) to indicate that the precedents contained therein are actually likely largely supportive of the original filings ~ as written, Plaintiff provides the following additional precedents and statutory basis to further support his original filings. Plaintiff appreciates the opportunity to respond, at least preemptively to motions to Dismiss on similar grounds. Plaintiff intended his filings comprise a ~'least cost spanning tree' of a ~nexus of arguments & issues.

### Subject Matter Jurisdiction:

Subject matter jurisdiction is generally traditionally established when the following conditions are met:

**1. Injury or Impending Harm**: A Plaintiff or witness has suffered an injury, or there is a "certainly impending" threat of future harm (Precedent: Clapper v. Amnesty Int'l, USA, 568 U.S. 398, 410 (2013)).

**2. Legal Basis for the Claim**: The claim presented is grounded in either statutory or common law.

**3. Personal Jurisdiction**: The court possesses personal jurisdiction over the parties involved in the case.

    Plaintiff believes that these conditions should have all been, or can be, satisfied, and that his Court should thus be able to properly exercise its authority to adjudicate the legal issues presented in the case.

### Substantial Federal Question(s) and Forum Convenience, Comprehensive Resolution, Joinders:

Plaintiff believes that this case does raise substantial federal question(s) under the test which the Order mentioned, set forth in {Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg, 545 U.S. 308, 312 (2005)}, as well as the test in {Gunn v. Minton 568 U.S. 251 (2013)}, as resolution should involve the interpretation and application of federal constitutional rights, with likely systemic impact. Specifically, Plaintiff believes Defendant(s)' actions in wrongfully detaining Plaintiff's property implicate the 4th, 5th, and 14th Amendments of the United States Constitution. Plaintiff also believes that:

**1. Necessarily Raised**:  Plaintiff's claim of wrongful detention of property implicates federal constitutional rights, which must be considered to resolve causes. The denials of access to Plaintiff's property raises concerns under the 4th Amendment's protection against unreasonable seizures, the 5th Amendment's due process guarantee, and the 14th Amendment's equal protection clause. These constitutional issues are <u>central</u> & <u>essential</u> to portions of claims & can't be avoided in legal resolution.

**2. Actually Disputed**: The federal constitutional issues presented in this case are actually disputed, as Plaintiff believes that initial Defendants' & Joinables' actions have violated U.S. constitutional rights, These disputes require resolving in just legal determination of Plaintiff's causes & requested relief(s).

**3. Substantial**: Federal constitutional issues in this case are substantial and implicate important federal interests. The interpretation and application of the 4th, 5th, and 14th Amendments in cases involving the wrongful detention of property implicate the balance between individual rights and the interests of property owners, which should be matters of significant federal concern (& to the whole system).

**4. Capable of Resolution in Federal Court**: Resolution of claims in federal court should not disrupt the federal-state balance approved by Congress. Federal courts regularly adjudicate cases involving the interpretation and application of federal constitutional rights, and this case should present no unique challenges that would warrant a departure from that practice.

In defense of federal subject matter jurisdiction in the associated Joinders, Plaintiff's 'nucleus' of claims involve multiple parties from different states, potentially implicating diversity♦ jurisdiction under 28 U.S.C.§1332. Furthermore, Plaintiff raises various federal questions, such as potential violations of the Sherman Act, the Clayton Act, the Defend Trade Secrets Act (DTSA), and the Digital Millennium Copyright Act (DMCA), which can provide federal jurisdiction under 28 U.S.C.§1331. Plaintiff's situation requires a <u>unified forum</u> to <u>economically</u> and <u>fairly</u> legally handle the complexities of his case, which involves multiple parties and a series of transactions over an extended period. Handling these matters in separate state courts, even if possible, might likely lead to <u>inconsistent judgments</u> and hinder Plaintiff's ability to obtain optimal remedies.  A federal court, with its ability to address both federal and state law claims, can provide a more <u>comprehensive resolution</u> for Plaintiff, ensuring that his rights are protected and justice legally served. [It is also recommended that this Court look into "DOJ Preps Antitrust Suit to Block Adobe's $20 Billion Figma Deal" :announced 2.23.2023].

## I. Additional Supporting Precedents:

**(a)** {Smith v. Kansas City Title & Trust Co., 255 U.S. 180 (1921)} The Court found federal question jurisdiction where the Plaintiff's state-law claim required an interpretation of federal law.

**(b)** {Gomez-Perez v. Potter, 553 U.S. 474 (2008)} The Court held that federal question jurisdiction could be invoked when a federal statute confers a right that is an essential element of state-law claims.

**(c)** {Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1 (1983)} The Court considered factors such as the presence of a substantial federal issue, the need for a uniform interpretation of federal law, and the effect on the federal-state balance in determining federal question jurisdiction.

**(d)** {Mims v. Arrow Financial Services, LLC, 565 U.S. 368 (2012)} This decision illustrates that federal question jurisdiction can exist even when a federal statute does not explicitly provide for a private right of action in federal court, so long as a substantial federal issue is present.

**(e)** {Holman v. Laulo-Rowe Agency, 994 F.2d 666 (9th Cir. 1993)} The Court found federal question jurisdiction when a state-law claim implicated significant federal issues, even though the Plaintiff did not specifically plead a federal cause of action.

**(f)** {Oneida Indian Nation of New York v. County of Oneida, 414 U.S. 661 (1974)} This decision demonstrates that a case can arise under federal law when a claim implicates significant federal issues and requires resolution of a substantial question of federal law.

**(g)** {Mathews v. Eldridge, 424 U.S. 319 (1976)} This case established the balancing test for determining what process is due under the 5th Amendment's guarantee of due process. The test weighs the private interest affected, the risk of erroneous deprivation, and the government's interest. This precedent supports Plaintiff's contention that denials of access to his personal property implicates the 5th Amendment's due process guarantee.

## II. Extra Statutory & Doctrinal & Other Basis:

**(a)** 42 U.S.C.§1983 - This statute provides a remedy for individuals whose constitutional rights have been violated by entities acting under 'color of state law', which Plaintiff's allegations demonstrate .

**(b)** {Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971)} [Also cited in original 'Brief']- In this case, the Supreme Court held that a cause of action could be implied directly under the U.S. Constitution for violations of constitutional rights by federal officials, and otherwise illustrates general

potential for federal jurisdiction in cases involving constitutional violations.

**(c)** Defendant(s)+ also have referenced environmental laws amongst excuses for obstructions. To the extent that their actions have been colored or otherwise directed by governmental requirements (i.e. R.C.R.A. or CERCLA), this too could contribute to jurisdiction.

**(d)** Also, **joint and several liability** at the federal level could benefit this case, as it should ensure that all parties responsible for the issues are held accountable. This principle has been established in cases such as {United States v. Bestfoods, 524 U.S. 51 (1998)}, in which the Supreme Court held that under CERCLA, a party who is found liable for cleanup costs at a contaminated site may be held jointly and severally liable with other potentially responsible parties, regardless of their degree of fault.

**(e)** The doctrine of 'Rooker-Feldman' indicates that actions which are originally brought at a state level, may not be able to be elevated to a federal level later, thus federal issues should be handled here first. {Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983)} [Plaintiff believes that issues raised in this federal court action are issues that lower courts have not yet addressed]

**(f)** Finally, sources of jurisdiction may be bolstered by a 'Declaratory Judgment' via 28 U.S.C.§ 2201.

**(g)** Ref: Cooper & Nielson's "Complete Diversity & Closing ... Federal Courts" on minimal diversity ♦

**(h)** Ref: Plaintiff's cousin Glanville's "*Tractatus De Legibus et Consuetudinibus Angliae*" on Replevin.

### III. Federal Jurisdiction Based on Preemption (or Complete Preemption):

Plaintiff contends that federal jurisdiction may also be proper based on the doctrine of federal pre-emption. The Supremacy Clause of the United States Constitution mandates that federal law preempts state law when there is a direct conflict between the two, or when federal law occupies a field so comprehensively that it leaves no room for state regulation. {Arizona v. U.S., 567 U.S.387,399 (2012)}.

In the present case, Plaintiff believes that constitutional issues raised in his Replevin claim implicate areas where federal law should preempt state law. Specifically, Plaintiff argues that his claim involves property rights and due process protections said to be guaranteed by the U.S. Constitution's 4th and 5th Amendments, which are federal law. Plaintiff further argues that these federal rights should preempt (perhaps even completely) any conflicting state law claims or defenses raised by Defendant(s).

This argument is supported by several precedents where federal preemption was found to provide a basis for federal subject matter jurisdiction. In {Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S.

546 (2005)}, the Supreme Court held that federal question jurisdiction existed where a Plaintiffs' state-law class-action claims were completely preempted by federal law. Similarly, in the 'test' precedent which your Order cited {Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308 (2005)}, the Court found that federal jurisdiction existed where a state-law quiet title action raised a substantial federal question regarding the meaning of a federal statute.  In such cases, federal jurisdic-tion may be appropriate even if Plaintiff's complaint doesn't explicitly raise federal question; i.e.:

{Caterpillar Inc. v. Williams, 482 U.S. 386 (1987)}{Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58 (1987)}

[Recommended contemplation: the 'Supremacy' and 'Commerce' Clauses in the U.S. Constitution].

## IV. Inferable Information (which may include any via recommended 'artful pleading doctrine's):

Plaintiff contends that the Court should have been able to infer substantial federal question from the facts and allegations, which include wrongful detention of property (which implicates property rights and due process protections guaranteed by the Constitution), governmental actors and/or involvement, HOA acting under 'color of state law' (and/or federal environmental laws), and violations of the 4th, 5th, and 14th Amendments. These satisfy the well-pleaded complaint rule.  Additionally, Defendant(s)'s {including those provided via Permissive Joinders} actions can be seen as infringements or violations of rights under 42 U.S.C.§1983. Determination of Plaintiff's personal property value, or replacing stock certificates, or Joinder of other Defendants, potentially necessitating interstate action, further may support potential alternate | additional diversity jurisdiction via 28 U.S.C.§1332◆(**Wherefore Plaintiff moves that any should be Joined if necessary**). Plaintiff's formal computer engineering education, requiring certification in multiple forms of logic, bolsters logical defensive arguments presented.

[**Note:** {Grable...vs...Darue} reportedly originally brought in State court & Federal question ~inferred]

## V. Potential Penalties for Judges burdening Parties w/Basic | Unnecessary Research:

**(a)** The 'Founding Fathers' of the U.S.A. justified their ~forcible adaptation and subsequent imposition of the English System of Law in part by adopting a perspective in which 'Liberty' was effectively at the opposite side of the spectrum of 'Taxation'; thus one might expect that 'Justice' should be also.

**(b)** Judges may face penalties for unduly burdening plaintiffs, i.e. with basic research, or failing to con-sider relevant case law, as in {Liteky v. United States, 510 U.S. 540 (1994)}, where the Supreme Court held that a judge's conduct during the course of judicial proceedings can be a basis for recusal if it

demonstrates favoritism or antagonism or impatience or disregard. In apparently (re)acting ~Day 1, before Plaintiff's original filings were even fully made available (with larger ones still not having been DL/d by Clerk), and likely without having taken the time to read associated cases, Plaintiff believes that this Judge's 'Order to Show Cause' has likely displayed impatience and some disregard, which may further qualify for Recusal in this case. Ref: 28 U.S.C.§455(a).

**Additional Supporting Precedents for Recusal:**

**(i)** {Berger v. United States, 255 U.S. 22 (1921)}: In this case, the Supreme Court held that even the appearance of bias on the part of a judge or unfairness can be sufficient grounds for recusal.

**(ii)** In {re Murchison, 349 U.S. 133 (1955)}: ... emphasised that judges should recuse themselves when their impartiality might reasonably be questioned, to maintain public confidence in the judiciary.

**VI. Brandeis' 'Court of Last Resort' Doctrine and Heretofore Unresolveable Aspects of the Case:**

Plaintiff thinks that Brandeis' 'Court of Last Resort' doctrine, which suggests that certain cases should be decided by the highest court when lower courts have been unable to resolve the dispute, should apply to this case. As previously mentioned, some issues presented in this case have already proved unresolveable at, or result from county &| probate &| city municipal levels. Given the complex and intricate nature of the legal issues and the constitutional rights involved, it is appropriate to consider the applicability of the 'Court of Last Resort' doctrine in the context of the current proceeding.

By invoking the 'Court of Last Resort' doctrine, Plaintiff seeks to demonstrate the necessity of a higher-level judicial intervention to resolve the case effectively. Aspects of this case, which other courts absolutely refused to even address, underscore the importance of ensuring matters are heard by a court with the authority, expertise, and experience necessary to adjudicate the complex issues at hand.

**VII. Background (Filing of this Complaint & Formal Education Support):**

**(a)** Plaintiff has been made aware that ~several filings were apparently missing from those he had originally sent to the Clerk on 3/13, which were initially accepted for uploading. Subsequent communication with the Clerk's office led to requests for changes in document format, contrary to 'pacer' recommendations, and eventually reverting to the original submission, and provided no stamped summons or rationale. The Clerk has also not yet rectified filing date records to reflect the initial submission date.

**(b)** In the selection of a presiding Judge, Plaintiff initially requested a Judge who was not a 'Magistrate

Judge' (due to concerns raised on internet forums about their reputed record of **bias** against 'Pro Se' litigants in the 10th Circuit) and preferred a male Judge, as the three other Judges in related proceedings have all been female. The original Clerk, 'Mike' {middle name?}, expressed no objection to this request. However, after payment was requested & received, instead, Plaintiff was assigned a Judge who appears to effectively (or at least recently) meet neither criteria.

**(c)** Plaintiff has a background in Computer Engineering, a field in which the principles of efficiency and succinctness are highly valued. Requiring Plaintiff to write defenses of jurisdiction even longer than the original body of the Complaint itself, via an Order nearly its size, contradicts these principles; entire books could be written about these subjects, yet such ought not to be necessary to proceed here.

[These discrepancies have raised Plaintiff's concerns about the fairness, trustworthiness, and transparency of the filing, judicial assignment, jurisdiction evaluation, and overall 'Justice' processes]

**WHEREFORE IN CONCLUSION:** Plaintiff believes that his claims ~satisfy {Grable/Gunn} test(s), & that the federal issues raised are necessarily a part of Plaintiff's Replevin & other action(s), as Plaintiff can't obtain relief here w/o establishing that Defendant(s)' actions violated Plaintiff's constitutional rights. Further, that these issues are actually disputed, as evidenced by Defendant(s)' continued obstruction &| denial(s) of any wrongdoing, &| refusals to cooperate. That federal questions raised are substantial, as they involve the interpretation of constitutional provisions and their application to the specific facts of causes of this case. Finally, that resolution of these issues in federal court shouldn't disrupt federal-state balance, as federal courts are well-equipped to handle claims involving constitutional questions.

Plaintiff believes that he has provided significant precedents and statutory basi(e)s for this Court's jurisdiction over this case, and facts & allegations in the Complaint raise substantial Federal questions. Further he feels that he has demonstrated that doctrines such as 'Court of Last Resort' support jurisdiction; also. Plaintiff respectfully requests and moves that, God Willing, the current Judge should consider ~Vacating the Order (alternatively, Plaintiff requests leave to amend the Complaint to address remaining necessary concerns) &| Recusing herself from this case in favor of a Judge with over 15 years of experience, possessing a broad range of expertise, and particularly adept at "De Novo" interpretation of multiple associated cases, &| for any other relief deemed appropriate &| just &| necessary.

Signature of 'Plaintiff': _David W Shaver_ /s/David W Shaver   (PRO SE)   Date: ___3.31.2023___

Address: _1750 30th St Suite A338, Boulder CO 80301_   Phone: _303-351-4239_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Nina Y. Wang

Civil Action No. 23-cv-00645-NYW

DAVID WILLIAM DACRES SHAVER,

     Plaintiff,

v.

WHITTIER CONDOMINIUMS HOA,

     Defendant.

---

## ORDER

---

This matter comes before the Court on Plaintiff's "Response to Judicial Order to Show Cause {of Federal Jurisdiction} of 3/14" [Doc. 24].  For the reasons set forth below, the Court concludes that Plaintiff David William Dacres Shaver ("Plaintiff" or "Mr. Shaver") has not met his burden of establishing this Court's subject matter jurisdiction over this case.  Accordingly, it is **ORDERED** that Plaintiff's "Complaint for Cause of Action : Replevin [Based on JDF 116] (FRCP Rule 64 &/or CRCP 104)" (the "Complaint") [Doc. 1] is **DISMISSED without prejudice** for lack of subject matter jurisdiction.  It is further **ORDERED** that Plaintiff is **GRANTED LEAVE** to file an amended complaint within **21 days** of the date of this Order that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

### BACKGROUND

Mr. Shaver initiated this civil action on March 13, 2023 against Defendant Whittier Condominiums HOA ("Defendant").  *See* [Doc. 1].  The Complaint states that "[t]his is an action to recover possession of personal property and/or damages."  [*Id.* at 1].  Plaintiff alleges that on

October 19, 2021, a fire occurred at the Whittier Place Condominiums complex and caused damages to Condominium #39, which contains Plaintiff's property. [*Id.*]. Plaintiff alleges that Defendant is wrongfully detaining his personal property "against the Plaintiff's claim of right to possession," [*id.*], and that Defendant has been "unresponsive and obstructive" in Plaintiff's efforts to re-obtain his property. [*Id.* at 4]. Plaintiff claims that "the refusals to allow [him] access to the condominium are in violation of U.S. law in a number of ways." [*Id.*]. The Complaint seeks the following relief: (1) a Court order directing Defendant to show cause why Plaintiff's property should not be obtained from Defendant and delivered to Plaintiff; (2) that the Court set a show-cause hearing "to make a preliminary determination concerning the right to possession of properties described in the Complaint"; (3) judgment in his favor "for the possession of the property"; and (4) costs and attorney's fees. [*Id.* at 5–6].

On March 14, 2023, this Court entered an Order to Show Cause directing Plaintiff to show cause why his case should not be dismissed without prejudice for lack of subject matter jurisdiction. *See* [Doc. 16]. The Court noted that the Complaint does not clearly allege any violation of federal law or other basis for federal jurisdiction. [*Id.* at 2 n.2 (noting that Plaintiff did not invoke diversity jurisdiction), 3]. And while the Court acknowledged that other filings in this case suggested that Plaintiff believes his constitutional rights have been violated, *see, e.g.*, [Doc. 9 at 3], the Court noted that "Plaintiff does not allege that Defendant is a government actor, and it does not appear plainly on the face of the Complaint that it is." [Doc. 16 at 4].

The Court also acknowledged, however, that state law claims raising a substantial question of federal law may be sufficient to establish federal question jurisdiction. [*Id.*]. But because Mr. Shaver had not addressed any of the relevant considerations in his filings, the Court could not conclude that the substantial question doctrine applies in this case. [*Id.* at 5]. For these reasons,

the Court directed Plaintiff to show cause, on or before March 31, 2023, why this case should not be dismissed without prejudice for lack of subject matter jurisdiction. [*Id.*]. Plaintiff filed his Response on March 31, 2023. *See* [Doc. 24]. The Court addresses Plaintiff's arguments below.

## LEGAL STANDARDS

### I.      Subject Matter Jurisdiction

A district court has an independent obligation to satisfy itself of its own jurisdiction. *See City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017). Accordingly, a court "may *sua sponte* raise the question of whether there is subject matter jurisdiction 'at any stage in the litigation.'" *Image Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)). A court should not proceed in a case unless it has first assured itself that jurisdiction exists. *See Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005).

28 U.S.C. § 1331 provides that federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." "For statutory purposes, a case can 'arise under' federal law in two ways. Most directly, a case arises under federal law when federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (alteration marks omitted). "Under the longstanding well-pleaded complaint rule . . . a suit arises under federal law only when the plaintiff's statement of his own cause of action shows that it is based upon federal law." *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) (quotation and brackets omitted); *see also Nicodemus v. Union Pac. Corp.*, 318 F.3d 1231, 1235 (10th Cir. 2003) ("A case arises under federal law if [the] well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." (citation and internal quotations omitted)). It "takes more

3

than a federal element to open the 'arising under' door" of § 1331. *Empire Healthchoice Assurance, Inc. v McVeigh*, 547 U.S. 677, 701 (2006). "[T]he Court must analyze the complaint to determine whether it is based on federal law." *Gwilt v. Harvard Square Ret. & Assisted Living*, 537 F. Supp. 3d 1231, 1237 (D. Colo. 2021). But in so doing, the Court ignores mere conclusory allegations of jurisdiction. *Penteco Corp. P'ship--1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991).

Second, even where a claim is based in state law, the Supreme Court "ha[s] identified a 'special and small category' of cases in which arising under jurisdiction still lies." *Gunn*, 668 U.S. at 258 (quoting *Empire Healthchoice*, 547 U.S. at 690). Specifically, state law claims that raise a substantial question of federal law may be sufficient to establish federal question jurisdiction. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). "To invoke this so-called 'substantial question' branch of federal question jurisdiction," the party invoking a federal court's jurisdiction must establish that "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 770 F.3d 944, 947 (10th Cir. 2014) (quoting *Gunn*, 568 U.S. at 258).

## II.     Pro Se Parties

In applying the above principles, the Court is mindful that Mr. Shaver proceeds pro se, and the Court thus affords his papers and filings a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). But the Court cannot and does not act as his advocate, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and applies the same procedural rules and substantive law to Plaintiff as to a represented party. *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.3 (10th Cir. 2008); *Dodson v. Bd. of Cnty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012).

## ANALYSIS

Mr. Shaver raises a number of arguments in his Response to the Court's Order to Show Cause.  First, he argues that his case fits within the "substantial question" doctrine, which suggests that his claims arise under state law.  [Doc. 24 at 1–2].  According to Plaintiff, "the Court should have been able to infer [a] substantial federal question from the facts and allegations, which include wrongful detention of property (which implicates property rights and due process protections guaranteed by the Constitution), governmental actors and/or involvement, HOA acting under 'color of state law' (and/or federal environmental laws), and violations of the 4th, 5th, and 14th Amendments."  [*Id.* at 5].  However, he goes on to argue that he "raises various federal questions" in his Complaint.  [*Id.* at 2, 3–4].  The Court first identifies the Parties to this action before turning to Plaintiff's various jurisdictional arguments.

## I.      The Parties to this Case

Simultaneously with the filing of his Complaint, Mr. Shaver filed a number of motions in this case.  *See* [Doc. 2; Doc. 10; Doc. 11; Doc. 12; Doc. 14].  And on March 15, 2023, Plaintiff filed an Amended Motion for Permissive Joinder of 3rdP [sic] if Appropriate (the "Motion for Joinder").  [Doc. 19].  In the Motion for Joinder, Plaintiff states that he "believes that permissive Joinder under FRCP Rule 20 may be appropriate in this Complaint, if in [sic] order to determine damages which may have been contributed to by the City of Boulder or its Departments."  [*Id.* at 1].  The Motion for Joinder then lists a number of governmental and private entities and individual persons, without explanation, including the Boulder Police Department; "Boulder Colorado Fire & Rescue"; the Boulder Municipal Court; Charles Taylor Engineering Tech. Services; Sentry

Property Management; American Family Mutual Insurance Company; Mollenkopf Property Mgt,

LLC; and CorVel Corporation.  [*Id.*].  The Motion for Joinder states that

> Plaintiff Moves that if after review of the Complaint, and the above []associated
> Case Filing(s)/report(s), this Court should determine it to be appropriate, this Court
> may permissibly Join any of the above parties, preferably provide leave to allow
> amendment of the Complaint to add Causes for Intentional Interference With
> Property Rights, and/or Interference With Right of Way and/or Right of Common
> [sic], and/or Violation of Civil Rights, & for any other relief deemed just & proper.

[*Id.*].

However, the entities or individuals listed in the Motion for Joinder are not current parties

to this case.  Although Mr. Shaver suggests that there are numerous Defendants in this action,

"including those provided via Permissive Joinders," [Doc. 24 at 5], the Federal Rules require that

all defendants be named in the caption of the complaint.  *See* Fed. R. Civ. P. 10(a).  The only

Defendant named in the Complaint's caption is Whittier Condominiums HOA.  *See* [Doc. 1 at 1].

Furthermore, to the extent Plaintiff attempts to add additional Defendants to this case through his

Motion for Joinder, the Court cannot proceed in this litigation or rule on any of Plaintiff's motions

without first satisfying itself of the Court's subject matter jurisdiction over the case.

*Cunningham*, 427 F.3d at 1245.  Indeed, subject matter jurisdiction "must be determined from the

allegations of fact in the complaint, without regard to mere conclusionary allegations of

jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  Accordingly, insofar as

Mr. Shaver attempts to rely on the "Joinables' actions" in his Response to the Order to Show Cause

to establish subject matter jurisdiction, [Doc. 24 at 2], he cannot do so, and the Court's subject

matter jurisdiction analysis is limited to the named Defendant and any claims asserted against that

entity.

## II.     Subject Matter Jurisdiction

### A.       Diversity Jurisdiction

First, although Plaintiff asserts in the Complaint that the Court has federal question jurisdiction, he argues in his Response that his "'nucleus' of claims involve multiple parties from different states, potentially implicating diversity jurisdiction under 28 U.S.C § 1332." [*Id.*]. Section 1332 states that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States." 28 U.S.C. § 1332(a)(1). As explained above, the only named Defendant in this matter is Whittier Condominiums HOA. *See* [Doc. 1 at 1]. Mr. Shaver does not allege in his Complaint what type of entity Defendant is, e.g., whether Defendant is a corporation or an unincorporated association. This information is essential to the Court's jurisdictional analysis because while a corporation is a citizen of both its state of incorporation and its principal place of business, 28 U.S.C. § 1332(c)(1), the citizenship of an unincorporated entity is determined by the citizenship of all of its members. *See Siloam Springs Hotel, LLC v. Century Sur. Co.*, 781 F.3d 1233, 1237–38 (10th Cir. 2015); *see also Sullivan v. Eaglestone Ranch Homeowners Ass'n*, No. 17-8067, 2018 WL 1224386, at *1 (10th Cir. Mar. 5, 2018) (finding that an HOA was an unincorporated association). Whether Defendant is a corporation or an unincorporated association, Plaintiff's allegations are insufficient to establish Defendant's state of citizenship because Plaintiff has not alleged Defendant's principal place of business or state of incorporation or, in the alternative, affirmatively identified all of Defendant's members. Accordingly, the allegations are insufficient to establish complete diversity of citizenship in this case for purposes of § 1332. *See Grynberg v. Kinder Morgan Energy Partners, L.P.*, 805 F.3d 901, 905 (10th Cir. 2015) ("Diversity jurisdiction requires complete diversity—no plaintiff may be a citizen of the same state as any defendant.").

### B.    Various Federal Statutes

Mr. Shaver next contends that the Court has federal question jurisdiction over this case because he "raises various federal questions, such as potential violations of the Sherman Act, the Clayton Act, the Defend Trade Secrets Act (DTSA), and the Digital Millennium Copyright Act (DMCA), which can provide federal jurisdiction under 28 U.S.C. § 1331." [Doc. 24 at 2]. The Complaint does not assert claims under any of these federal statutes nor mention any of these statutes. *See generally* [Doc. 1]. Indeed, the words "copyright" and "trade secret" do not appear in the Complaint. [*Id.*]. Nor does the Complaint allege facts, taken as true, that would allow a factfinder to conclude that any of these federal statutes has been violated. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Even though a pro se plaintiff's pleading is entitled to a liberal construction, the mere use of federal law labels is insufficient to invoke federal question jurisdiction. *See Firstenberg v. City of Santa Fe*, 696 F.3d 1018, 1025 (10th Cir. 2012) (holding pro se litigant's "reference in the complaint to four different sources of federal law" was insufficient to establish federal question jurisdiction). As mentioned above, a claim "'arises under' federal law for 28 U.S.C. § 1331 purposes 'only when the plaintiff's statement of his own cause of action shows that it is based upon federal law." *Vaden*, 556 U.S. at 60 (quotation and brackets omitted). The Complaint does not show that Plaintiff's case arises under any of these statutes; accordingly, Plaintiff's invocation of these statutes in his Response is insufficient to establish federal subject matter jurisdiction.

Similarly, the Court is respectfully unpersuaded by Plaintiff's argument that "Defendants(s)+ [sic] also have referenced environmental laws amongst excuses for obstructions" and "[t]o the extent that their actions have been colored or otherwise directed by governmental requirements (i.e. R.C.R.A. [(the Resource Conservation and Recovery Act)] or CERCLA [(the Comprehensive Environmental Response, Compensation, and Liability Act)]), this too could

8

contribute to jurisdiction." [Doc. 24 at 4]. An "assertion by a defendant of a defense based on federal law" is not sufficient "to confer federal jurisdiction." *Firstenberg*, 696 F.3d at 1025. In addition, Defendant has not filed an Answer or otherwise responded to the Complaint to date; indeed, it is not clear that the Defendant has been properly served or has waived service at this juncture. *See* Fed. R. Civ. P. 4(c); *see also* [Doc. 23]. In any case, Plaintiff cannot rely on any anticipated defenses of Defendant to establish subject matter jurisdiction. *See Nicodemus*, 440 F.3d at 1232 ("The well-pleaded complaint rule . . . means that federal-question jurisdiction may not be predicated on a defense that raises federal issues.").

### C.      42 U.S.C. § 1983

Plaintiff next asserts that this Court has federal jurisdiction based on 42 U.S.C. § 1983 because "[t]his statute provides a remedy for individuals whose constitutional rights have been violated by entities acting under 'color of state law[,'] which Plaintiff's allegations demonstrate." [Doc. 24 at 3]. Plaintiff directs the Court to no specific allegations in his Complaint that sufficiently allege that Defendant has acted under color of state law. *See* [*id.*]. Having reviewed the Complaint, the Court concludes that there are no allegations that Defendant acted under color of state law, let alone supporting factual allegations plausibly supporting any such assertion. Because Mr. Shaver does not assert claims against any state actors or allege that Defendant has acted under color of state law, he cannot rely on § 1983 as a basis for federal jurisdiction.

### D.      *Bivens*

Mr. Shaver contends that *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), "illustrates general potential for federal jurisdiction in cases involving constitutional violations." [Doc. 24 at 3–4]. As acknowledged by Plaintiff, *see* [*id.*], in *Bivens*, "the Supreme Court recognized an implied cause of action <u>against federal actors</u> in their individual capacities for

deprivation of Fourth Amendment rights." *Punchard v. U.S. Bureau of Land Mgmt.*, 180 F. App'x 817, 819 (10th Cir. 2006) (emphasis added). Plaintiff, who does not allege that Defendant is a federal actor, has not asserted a *Bivens* cause of action. *See generally* [Doc. 1]. Thus, this is not a basis for federal jurisdiction under § 1331.

### E.   The *Rooker-Feldman* Doctrine

Next, Plaintiff asserts that "[t]he doctrine of 'Rooker-Feldman' indicates that actions which are originally brought at a state level, may not be . . . elevated to a federal level later, thus federal issues should be handled here first." [Doc. 24 at 4]. The *Rooker-Feldman* doctrine is an abstention doctrine that "precludes lower federal courts 'from effectively exercising appellate jurisdiction over claims actually decided by a state court and claims inextricably intertwined with a prior state-court judgment.'" *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010). It is not a source of federal subject matter jurisdiction.

### F.   The Declaratory Judgment Act

Mr. Shaver also argues that "sources of jurisdiction may be bolstered by a 'Declaratory Judgment' via 28 U.S.C. § 2201." [Doc. 24 at 4]. To the extent this statement can be construed as an argument that this Court has subject matter jurisdiction over this case pursuant to the Declaratory Judgment Act, it is well settled that the Declaratory Judgment Act "does not confer jurisdiction upon federal courts, so the power to issue declaratory judgments must lie in some independent basis of jurisdiction." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 964 (10th Cir. 1996) (citations omitted). Accordingly, setting aside the fact that Plaintiff appears to request only injunctive and monetary relief in his Complaint—not a declaratory judgment, *see* [Doc. 1 at 5–6]—the Declaratory Judgment Act does not operate to confer jurisdiction in this case.

### G.     Preemption

Plaintiff "contends that federal jurisdiction may also be proper based on the doctrine of federal preemption." [Doc. 24 at 4]. He states that he "believes that constitutional issues raised in his Replevin claim implicate areas where federal law should preempt state law," for example, because "his claim involves property rights and due process protections said to be guaranteed by the U.S. Constitution's 4th and 5th Amendments, which are federal law." [*Id.*]. Again, Plaintiff has sued only a private entity in this case and has not asserted any cognizable claims under the United States Constitution. Insofar as Plaintiff suggests that his state-law claims raise a substantial federal question, this argument is addressed below.

### H.     Substantial Federal Question

Finally, the Court turns to Plaintiff's argument that his case raises a substantial federal question. [Doc. 24 at 5]. As mentioned above, the party invoking a federal court's jurisdiction based on the substantial question doctrine must establish that "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Becker*, 770 F.3d at 947. This "substantial question" branch of cases has "narrow boundaries." *Id.*; *see also Gilmore v. Weatherford*, 694 F.3d 1160, 1171 (10th Cir. 2012) ("[T]his branch of arising-under jurisdiction is a slim one."). "[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Becker*, 770 F.3d at 947. And "if a claim does not present 'a nearly pure issue of law, one that could be settled once and for all and thereafter would govern numerous cases,' but rather is 'fact-bound and situation-specific,' then federal question jurisdiction will generally be inappropriate." *Id.* at 947–48 (quoting *Empire Healthchoice*, 547 U.S. at 700–01) (ellipses omitted).

Plaintiff argues that his "claim of wrongful detention of property implicates federal constitutional rights, which must be considered to resolve causes," such that a federal issue is "necessarily raised" in this case. [Doc. 24 at 4]. A federal question is "necessarily raised" only if it is a "necessary element of one of the well-pleaded state claims" or whether it is "'really' one of federal law." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 13 (1983). This is not the case here. It appears that Plaintiff has sued a non-governmental Defendant for replevin. "Replevin is a possessory action in which a claimant seeks to recover both possession of personal property that has been wrongfully taken or detained and damages for its unlawful detention." *City & Cnty. of Denver v. Desert Truck Sales, Inc.*, 837 P.2d 759, 763 (Colo. 1992). A replevin plaintiff must demonstrate (1) that the plaintiff is the owner of the property claimed; and (2) that the property is being detained by the defendant against the plaintiff's claim of right to possession. *Id.*; *see also* Colo. R. Civ. P. 104(b)(1)–(2). Thus, a replevin action against a private actor concerns rights of ownership and possession, not constitutional rights concerning the governmental seizure of property. Moreover, and importantly, the allegations in the Complaint suggest that this case "does not present a nearly pure issue of law, one that could be settled once and for all and thereafter would govern numerous cases, but rather is fact-bound and situation-specific." *Becker*, 770 F.3d at 947–48 (citation, internal quotations, and ellipses omitted). In this type of case, "federal question jurisdiction [is] generally . . . inappropriate." *Id.* at 948.

The Court must exercise "prudence and restraint" in conducting the substantial-question analysis. *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 (1986). Mr. Shaver has not demonstrated that a federal question is an essential element of his claim(s), let alone a substantial

12

one.  This case is therefore not within the "special and small category of cases" in which a federal court may exercise jurisdiction over a state-law claim.  *Gunn*, 568 U.S. at 258.

In sum, Plaintiff has not met his burden to establish subject matter jurisdiction in this case. In addition, given Plaintiff's exhaustive arguments in his Response and the lack of clarity in the Complaint, the Court concludes that entering a second order to show cause would not be efficient in this matter.  Accordingly, Plaintiff's Complaint is **DISMISSED without prejudice** for lack of subject matter jurisdiction.  Plaintiff **is GRANTED LEAVE** to file an amended complaint within **21 days** of the date of this order.  **Plaintiff is expressly advised that if he declines to file an amended complaint by the Court's deadline, the Court will direct the Clerk of Court to terminate this case.**

If Plaintiff chooses to file an amended pleading, he is expressly **ADVISED** of his obligation to comply with Rule 8 of the Federal Rules of Civil Procedure, which provides that a complaint must contain (1) a short and plain statement of the grounds for the Court's jurisdiction; (2) a short and plain statement of any claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought.  Fed. R. Civ. P. 8(a).  Rule 8(d)(1) requires that "[e]ach allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1).  "Taken together, Rules 8(a) and (d)(1) underscore the emphasis placed on clarity and brevity by the federal pleading rules.  Prolix, vague, or unintelligible pleadings violate Rule 8."  *Gravley v. Hunter*, No. 18-cv-00171-GPG, 2018 WL 10320585, at *1 (D. Colo. Apr. 6, 2018).  Rule 8 has been construed to require claimants to specifically delineate their claims for relief.  *See Polovino v. Int'l Bhd. of Elec. Workers, AFL-CIO*, No. 15-cv-023-JHP-PJC, 2015 WL 4716543, at *4 (N.D. Okla. Aug. 7, 2015) ("A complaint falls short of Rule 8's notice requirement when it fails to list or clearly articulate any causes of action.").  "Claims must be presented clearly and concisely in a manageable format that allows the

Court and Defendants to know what claims are being asserted and to be able to respond to those claims." *Moore v. Cosarrubias*, No. 18-cv-00259-GPG, 2018 WL 11145813, at *2 (D. Colo. Mar. 9, 2018).   To meet the requirements of Rule 8, Mr. Shaver must provide more than "a bare averment that he wants relief and is entitled to seek it." *Noor v. Hickenlooper*, No. 13-cv-00692-REB-CBS, 2013 WL 1232201, at *1 (D. Colo. Mar. 26, 2013).   In addition, Mr. Shaver must comply with Rule 10 and list all Defendants he wishes to sue in the caption of any amended pleading he chooses to file.

## III.   Recusal

Finally, Mr. Shaver suggests that the undersigned should recuse herself from this case. First, he contends that "[j]udges may face penalties for unduly burdening plaintiffs, i.e. with basic research, or failing to consider relevant case law."  [Doc. 24 at 5].  He represents that he "believes this Judge's 'Order to Show Cause' has likely displayed impatience and some disregard, which may further qualify for Recusal in this case."  [*Id.* at 6].  Mr. Shaver also references case law establishing that judges should recuse themselves where their impartiality might reasonably be questioned.  [*Id.*].

Pursuant to 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify [herself] in any proceeding in which [her] impartiality might reasonably be questioned."  Recusal is required when "a reasonable person, knowing all the facts, would harbor doubts about the judge's impartiality."  *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 659 (10th Cir. 2002).  But recusal is not warranted because of "unsubstantiated suggestions of personal bias or prejudice," *id.* at 659–60, and "a judge has as strong a duty to sit when there is no legitimate reason to recuse as [she] does to recuse when the law and facts require." *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995).  Where a party seeks recusal of a judicial

14

officer, there is a "substantial burden on the moving party to demonstrate that the judge is not impartial" by presenting facts that support the objective perception of potential bias. *In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir. 2004).

The Court respectfully disagrees that recusal is warranted here. As previously explained to Mr. Shaver, this Court is obligated to assure itself of its jurisdiction over every case and cannot proceed without satisfying itself of its jurisdiction. *Cunningham*, 427 F.3d at 1245. Mr. Shaver offers no basis as to why this Court's impartiality might reasonably be questioned based on its issuance of the Order to Show Cause, which all judges in this District issue on a regular basis, particularly to inquire about the Court's jurisdiction to proceed. In addition, while the Court is mindful that Plaintiff proceeds without an attorney and therefore, the Court interprets his filings liberally, Plaintiff must still comply with procedural rules and substantive law as is required of represented parties. *See Murray*, 312 F.3d at 1199 n.3 (observing that a party's pro se status does not relieve him of the obligation to comply with procedural rules) (citation omitted); *Dodson*, 878 F. Supp. 2d at 1236.

It is well settled that adverse rulings, or rulings that a party does not agree with, do not provide a sufficient basis for recusal. *See Glass v. Pfeffer*, 849 F.2d 1261, 1268 (10th Cir. 1988); *Green v. Dorrell*, 969 F.2d 915, 919 (10th Cir. 1992). Accordingly, Mr. Shaver has not met the substantial burden of demonstrating why the undersigned's recusal is required in this case.

## CONCLUSION

For the reasons set forth herein, it is **ORDERED** that:

(1)     The Order to Show Cause [Doc. 16] is **MADE ABSOLUTE**;

(2)     Plaintiff's Complaint [Doc. 1] is **DISMISSED without prejudice** for lack of subject matter jurisdiction;

(3)     Plaintiff is **GRANTED LEAVE** to file an amended complaint within **21 days** of

the date of this Order;

(4)     Plaintiff is **ADVISED** that any amended pleading must comply with Rule 8 and

Rule 10 of the Federal Rules of Civil Procedure;

(5)     Plaintiff is **ADVISED** that **<u>if he fails to file an amended pleading by the Court's</u>**

**<u>deadline, this Court will direct the Clerk of Court to terminate this case</u>**

**<u>without further warning from the Court</u>**;

(6)     The pending Motions in this case [Doc. 2; Doc. 10; Doc. 11; Doc. 12; Doc. 14;

Doc. 19] are **DENIED without prejudice as moot**; and

(7)     A copy of this Order shall be sent to:

David William Dacres Shaver
1750 30th Street
#A338
Boulder, CO 80301


DATED:  April 12, 2023                          BY THE COURT:

                                                _____
                                                Nina Y. Wang
                                                United States District Judge

☐ District Court ☐ Boulder County ☐ Boulder Municipal Court
■ Federal Court
Address: 901 19th Street, Denver, CO 80294

Plaintiff:          David William Dacres Shaver
Vs. Defendant(s):   Whittier Condominiums HOA,
                    (City of Boulder Sent Notice)

'Pro Se' Party/Not member of Colorado Bar (Name and Address):

David William Dacres Shaver
1750 30th St Suite A338, Boulder CO 80301
Phone Number: 303-351-4239 eMail:davidwshaver@yahoo.com
(Amended Original)

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
1:07 pm, May 03, 2023
JEFFREY P. COLWELL, CLERK

Δ COURT USE ONLY Δ

Case Number:

23-cv-00645-NYW

**BRIEF IN SUPPORT OF COMPLAINT FOR REPLEVIN+ / PRELIMINARY INJUNCTION**

**Standards for judgement on this issue appear to include FRCP Rule 64,65,CRCP Rule 104 &| 365**

**STATEMENT OF FACTS:**

Plaintiff believes that this Brief supports & relies upon the Verified Complaint, providing precedents, factual allegations & claims (along with other filings) demonstrating Plaintiff's entitlement to relief.

**INTRODUCTION TO ISSUES:**

This brief seeks to demonstrate that Plaintiff is entitled to a replevin recovery of their possessions, from the fire-damaged condominium, and/or damages, as the actions of the Defendant(s) have unjustly prevented Plaintiff from accessing or repossessing personal property. Plaintiff intends to analyze provided supporting precedents and show how they support our arguments, including that the Defendant(s)' actions have violated Plaintiff's Rights under the U.S. Constitution.

[Historically, under English foundations of common law, a creditor was permitted to use self-help to recover possession of a 'chattel' that was wrongfully detained, provided this could be accomplished without breaching the peace.' Blackstone's Commentaries on the Laws of England (Book 3, Chapter 1 (II)): "Recaption or reprisal is another species of remedy by the mere act of the party injured. This happens when any one hath deprived another of his property in goods or chattels personal, . . . in which case the owner of the goods . . . may lawfully claim and retake them wherever he happens to find them, so it be not in a riotous manner, or attended with a breach of the peace."]

**[RULES]**

**1)** Forcible Self-help was reportedly effectively the original recourse, before Glanville's "Tractatus de legibus et consuetudinibus regni Anglie" ~invented a more procedural approach to the law, including

'replevin' to recover one's property.  Plaintiff's attempts at self-help repossession of his property have been repeatedly rebuffed; his suggestions of alternative methods (i.e. professional rope access technicians, or robotic recovery) met only with silence, his requests for statutory or legal basis ignored.  What few excuses yet given, have largely had reference to insurance policies, rather than the letter or intent of any law.  The situation as it stands appears clearly not to be what the founders of the English legal system intended.  Even the 'Universal Commercial Code' of today (i.e. CRS 4-9-629,4-9-609(2)) shows clear basis for the intent of self-help retaking of one's own property, if you adopt the proper perspective (and some of Plaintiff's company (D'Acre Holdings llC of Colorado)'s property, which he effectively lent to himself!, is on premises!).

2)   According to the United States' Constitution: The 5th Amendment holds that "no person shall be ... deprived of life, liberty, or property, without due process of law .... ", and the 14th Amendment (Civil Rights) says "no state shall ... deprive any person of life, liberty, or property, without due process of law .... ". Colorado's constitution also contains a due process provision. Section 25 of Article II reads: "Due process of law. No person shall be deprived of life, liberty or property, without due process of law".  If the destruction of the property were allowed to occur before portions of this action were allowed to be decided on its merits, Plaintiff believes that would be a violation of due process.

3)   Further: U.S. 4th Amendment rights. Under the 4th Amendment, seizures of property must be reasonable under the circumstances. In {Segura v. United States, 468 U.S. 796 (1984)}, the Supreme Court clarified the interpretation of the 4th Amendment, holding that the rights of owners to access their own property can only be delayed for the amount of time necessary to obtain any necessary warrant(s) for investigation. In {Chambers v Maroney, 39 U.S. 42 (1970)}, the Supreme Court held that the 4th Amendment's prohibition on unreasonable seizures applies to the seizure of property as well as to the seizure of persons. In {U.S. v. Place, 462 U.S. 696 (1983)}, the Supreme Court held that seizures may become unreasonable because of their duration. In {Nardone v United States, 308 U.S. 338 340 (1939)}, the Supreme Court held that indirectly enforcing a long-term illegal seizure of residents' property is "inconsistent with ethical standards and destructive of personal liberty."  Other applicable prece-

dents appear to include: {United States v. Jacobsen, 466 U.S. 109 (1984)}: In this case, the Supreme

Court held that the 4th Amendment's prohibition on unreasonable searches and seizures applies to the

seizure of tangible property, such as packages. Also, {Soldal v. Cook County, 506 U.S. 56 (1992)}: In

this case, the Supreme Court held that the 4th Amendment's prohibition on unreasonable seizures

applies to the seizure of mobile homes, & that seizure of a mobile home must be reasonable under the

circumstances.

 **4)**  Colorado Revised Statutes section (i.e. CRS § 24-10-103) lends support for a Cause of Action

for Civil Rights violations.  In this case, Plaintiff believes that his, and other residents, U.S. 4th

Amendment rights their own property were infringed upon.  His attempts to peacefully use self-help to

recover personal possessions were even met with force.  Federal law, i.e.: 18 U.S.C. 242 : +'depriva-

tion of rights' indicates that Police are generally considered to be acting under color of state law in the

performance of their duties.  Here are some notable precedents, particularly for **'Color of' State Law**:

{Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974)}: ...a

private party is a state actor when there is a sufficiently close nexus between the government and the

challenged action of the private party that the action of the private party is fairly treated as that of the

government itself; Further the 'symbiotic relationship test', {Burton, 365 U.S. at 862}: a private party

is a state actor when the government has so far insinuated itself into a position of interdependence with

that party that the government must be recognized as a joint participant in the challenged activity.

{Monroe v. Pape, 365 U.S. 167 (1961)}: In this landmark case, the Supreme Court held that 42 U.S.C.

§ 1983 provides a cause of action for individuals whose constitutional rights are violated by state offi-

cials, even if the state officials acted in violation of state law.  {Estelle v. Gamble, 429 U.S. 97

(1976)}: This case expanded the scope of § 1983 actions by establishing that deliberate indifference to

an inmate's serious medical needs can constitute cruel and unusual punishment under the Eighth

Amendment, thus providing a basis for a § 1983 action. {Monell v. Dept of Soc. Servs., 436 U.S. 658,

701 (1978)} holding that cities/municipal corps may be named in Section 1983 lawsuits. {Owen v. City

of Independence, 445 U.S. 622 (1980)}: further clarified that municipalities, as well as individuals,

could be held liable under § 1983 for constitutional violations, and that municipalities are not immune

from liability for damages under § 1983. {Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982)}: In this

case, the Supreme Court established a two-part test for determining whether a private party's conduct

could be considered state action for the purposes of § 1983. The Court held that the conduct must be

fairly attributable to the state, and that the private party must have acted under the color of state law.

{Richardson v. McKnight, 521 U.S. 399 (1997)}: private corporations are not immune.  Government

actors don't necessarily have to be directly included as Defendant(s). {Adickes v. S.H. Kress & Co.,

398 U.S. 144 (1970)}: ... ~ private parties can be held liable via § 1983 for conspiring w/state officials

to deprive someone of constitutional rights. **Applications including consideration of 'Color of'**

**Federal law**: {Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388

(1971)}.  This case established that individuals have a right to bring a federal Civil Rights action for

damages against officials who have violated their 4th Amendment rights.  'Bivens'has also been

applied against private companies acting under 'Color of' Federal law:  {Sarro v. Cornell Corrections,

Inc., 248 F.Supp.2d 52,59 (D.R.I. 2003)} (which also held that held private companies can be held

liable via Bivens, especially when there is no alternative remedy against them).  Plaintiff believes that

these are in line with 'joint and several liability' concepts, and that parties should be able to join other

Defendants if necessary or appropriate for fair distribution of responsibility.

**5)**   In further precedent such as {Levine v Katz 192 P 3d 1008 (2006)}(II) Colorado Court of

Appeals considered it an error to 'dismiss for lack of subject matter jurisdiction', holding that Plaintiff

must be provided a 'forum in which to obtain legal redress'.[DNPC#21PR30635:.07.30][Doc 24 p6]

**6)**   The argument in favor of a preliminary injunction is supported by C.R.C.P Rule 365, according

to which injunctions may be granted in Colorado counties if after: "(c)(1) (a) it clearly appears from

specific facts shown by affidavit or by the verified complaint or by testimony that immediate and

irreparable injury, loss, or damage will result to the plaintiff before the adverse party or the party's

attorney can be heard in opposition, and (b) the plaintiff or the plaintiff's attorney certifies to the court

in writing or on the record the efforts, if any, which have been made to give notice and the reasons sup-

porting a claim that notice should not be required".  Further, {Rathke v. MacFarlane (State of Colorado), 648 P.2d 648 (Supreme Court of Colorado, 1982)} established six factors for evaluation of injunctions in Colorado, which Plaintiff believes have been met <see below>.

**7)**  Precedents that could potentially support the use of judicial inference in these filings: {Ashcroft v. Iqbal, 556 U.S. 662 (2009)}: This case established that a plaintiff can plead sufficient factual content that allows the court to draw a reasonable inference that the defendant may be held liable for the alleged misconduct. {United States v. Simpson, 813 F.3d 706 (8th Cir. 2016)}: Held that judicial inference may be used to draw reasonable inferences from circumstantial evidence, as long as those inferences aren't merely based on speculation or conjecture.  Plaintiff believes that the evidence, and references to the Public Record, should thus receive Judicial Notice during evaluation (i.e. FRCP 201(b)).

**8)**  Plaintiff believes that access to personal property should be supported by such laws as: easements (i.e. CRS Title 38) i.e. by prior use and/or estoppel {Lobato v. Taylor, 71 P.3d 938}: ... are implied or inferable, referring further to: (see also {Wright v. Horse Creek Ranches, 697 P.2d 384, 387-88 (Colo. 1985)} (noting that an easement may be established by "necessity; by preexisting use; by express or implied grant; or by prescription")); {Wagner v. Fairlamb, 151 Colo. 481, 484, 379 P.2d 165, 167 (1963)} (noting that implied easements are "not expressed by the parties in writing, but … arise out of the existence of certain facts implied from the transaction")}]. For a "An Overview of Colorado Easement Law" {Ref: https://cl.cobar.org/features/an-overview-of-colorado-easement-law/},

**9)**  Plaintiff's research indicates that there also appears to be ample case precedent for amendment of complaints when additional damages or causes (which may have not been determinable at the start {Foman v. Davis, 371 U.S. 178 (1962)}: This Supreme Court case ruled that leave to amend a complaint should be "freely given when justice so requires," allowing for the possibility of adding additional claims or causes of action based on new information.  {Tech Telecommunications, Inc. v. Time Warner Cable, Inc., 714 F.3d 1277 (10th Cir. 2013)}: This Tenth Circuit case dealt with pleading standards for patent infringement claims but has implications for amending complaints. The court held that "a plaintiff must provide some factual basis for its claims, but need not allege every supporting fact.".

{<u>Gray v. Phillips Petroleum Co., 971 F.2d 591 (10th Cir. 1992)</u>} - The 10th Circuit affirmed the district court's decision to allow the plaintiff to amend the complaint after the statute of limitations had run, based on the discovery of new information during the course of litigation.  {<u>Beeck v. Aquaslide 'N' Dive Corp., 562 F.2d 537 (10th Cir. 1977)</u>} In this case, the court held that a party may amend their pleadings when justice so requires, even when new issues are introduced or when the opposing party may be prejudiced, as long as the prejudice is not undue.

   **10)**   NFPA 921 establishes standards for testing of substances which may have caused a fire (i.s. Chapter 4,16,<u>17.5.4</u>,18), indicating that Defendant(s) apparent refusals to test appear unwarranted. (i.e. Substances used supposed to comply with NFPA 101, Ch. 10: Exterior Wall Finish, and/or NFPA 5000, Chapter 8 Fire-Resistance-Rated Construction and/or Ch. 14: Exterior Walls, and/or Ch. 34: Egress). CERCLA, 42 U.S.C. § 9601 et seq establishes a broad framework for the identification, investigation, and cleanup of hazardous substances.  Under current U.S. Law, enforcement authority is granted to the **President of the U.S.A.,** who delegates this authority to the Environmental Protection Agency (EPA).

   **11)**   Plaintiff hasn't yet received results from requested investigations (or ~discovery requests there-of), into HOA ownership/agent changes*, or chemical analyses of building construction components.

   **12)**   In {<u>United States v. James Daniel Good Real Property, 510 U.S. 43 (1993)</u>}, the U.S. Supreme Court held that the government must provide an opportunity for a pre-seizure hearing for property that is ~ subject to forfeiture, to ensure that a resident's property rights are protected.

## [APPLICATION]

   Plaintiff is of the belief that: immediate and irreparable injury, loss, and/or damage of the sorts outlined in the complaint may result to the Plaintiff if Defendant(s) are allowed to continue in their course of action. Plaintiff has supplied a verified action for replevin, and evidence, which it believes should satisfy FRCP 65, and CRCP Rule 365's requirements for an injunction. Further that Plaintiff's complaint should succeed on the merits. Moreover, that the first four factors requested by the precedent of Rathke v. MacFarlane have been illustrated on the Motion for Preliminary Injunction; the fifth factor, that "the balance of the equities favors entering an injunction," can most

likely be shown to be met in this case by comparing the potential loss of Plaintiff's property to that of the cost of delay (none of which Plaintiff believes should have been necessary if the City or HOA had facilitated recovery earlier). The sixth Rathke factor, "that the injunction will preserve the status quo pending a trial on the merits," would clearly have been easily met if the City or HOA had allowed access to the property as requested, months ago. Plaintiff's personal property is in jeopardy (which property has received valuations in excess of the HOA's insurance limits alone), and assurances of full reimbursement , even of those items deemed 'replaceable' have not yet been satisfactorily provided by parties.  Any samples for chemical testing of building materials should be acquired before demolition.  Plaintiff believes that the apparent Civil Rights, and/or Unjust Takings violations should also provide a basis for injunctive relief, and that issues such as these, and others outlined in the complaint, provide clear evidence of injustice that should be addressed before demo-lition may be allowed; further, that Defendant(s) are clearly attempting to obstruct Plaintiff's rights under U.S. law, including to due process, in deciding these matters.

## [CONCLUSION]

In conclusion, Plaintiff believes to have demonstrated through analysis of relevant precedents that Plaintiff's civil rights have been violated by the Defendant(s)' actions, which have unlawfully pre-vented the Plaintiff from accessing possessions in the fire-damaged condominium, and that there is legal basis which supports his actions and requests. The policy implications of the Court's decision are critical, as a ruling in favor of Plaintiff would not only protect Plaintiff's rights but also serve as a deterrent against similar violations in the future. We hereby request that the Court should grant Plaintiff's complaint for replevin recovery and send a clear message that violations of Civil and/or Property Rights will not be tolerated, and any associated damages or other appropriate relief."

[Plaintiff believes that time is of the essence in at least the Replevin Action of this Complaint, and thus has provided this initial brief with the intention of amending later (Rule 15) or as allowed]

Signature of 'Plaintiff': _/s/David W Shaver_   (PRO SE)   Date: ___5.03.2023___

Address: _1750 30th St Suite A338, Boulder CO 80301_   Phone: _303-351-4239_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00645-NYW

DAVID WILLIAM DACRES SHAVER,

     Plaintiff,

v.

WHITTIER CONDOMINIUMS HOA,

     Defendant.

---

## FINAL JUDGMENT

---

     In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

     Pursuant to the Orders of United States District Judge Nina Y. Wang entered on April 12, 2023 [Doc. 27] and May 9, 2023 [Doc. 33], it is

     ORDERED that the Response and Motion to Stay/Extend Termination/Order of 4.12 Pending Intended Appeal Outcome [Doc. 32] is DENIED.  It is

     FURTHER ORDERED that because Plaintiff's Complaint has been dismissed without prejudice for lack of subject matter jurisdiction, and because Plaintiff has not filed an amended pleading by the Court's deadline, this case is TERMINATED.  It is

     FURTHER ORDERED that final judgment is hereby entered in favor of Defendant Whittier Condominiums HOA and against Plaintiff David William Dacres Shaver.

Dated at Denver, Colorado this 9th day of May, 2023.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: s/Emily Buchanan
Emily Buchanan, Deputy Clerk

| ☐District Court ☐Boulder County ☐Boulder Municipal Court<br>☑Federal Court<br>Address:901 19th Street, Denver, CO 80294 | **FILED**<br>**UNITED STATES DISTRICT COURT**<br>**DENVER, COLORADO**<br>6/7/2023<br>**JEFFREY P. COLWELL, CLERK** |
|---|---|
| Plaintiff:          David William Dacres Shaver<br>Vs. Defendant(s):   Whittier Condominiums HOA,<br>City of Boulder, Officer Brandan Brisco | **Δ COURT USE ONLY Δ** |
| 'Pro Se'Party/Not member of Colorado Bar (Name and Address)<br><br>David William Dacres Shaver<br>1750 30th St Suite A338, Boulder CO 80301<br>Phone Number: 303-351-4239 eMail:davidwshaver@yahoo.com | Case Number:<br><br>**23-cv-00645-NYW** |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiff intends by this notice to Appeal this case to the United States Court of Appeals for the Tenth Circuit from the 'Final Order' [Doc 34] and associated filings, last entered in the United States District Court for the District of Colorado on 5.9.2023.

Signature of 'Plaintiff': _/s/David W Shaver_   (PRO SE)   Date: ____6.7.2023____

Address:  1750 30th St Suite A338, Boulder CO 80301_____   Phone:  __303-351-4239__

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Notice of Appeal has also been served via having been posted by regular mail upon [Suzanne Leff, Attorney, WLPP Law, 8020 Shaffer Parkway, Suite 300, Littleton, CO 80127], as well as being served electronically via eMail upon both Suzanne M. Leff <sleff@wlp-plaw.com> (current 'RegisteredAgent'), and Christine Mollenkopf <christine@boulderhoa.com> : Whittier HOA billing (located at the prior registered agent's address, ~ at the time of the fire).

Signature of 'Plaintiff': _/s/David W Shaver_   (PRO SE)   Date: ____6.7.2023____

Address:  1750 30th St Suite A338, Boulder CO 80301_____   Phone:  __303-351-4239__